## Wytheville.

### JONES v. MURPHY.

#### JUNE 11, 1896.

#### Absent, Harrison, J.

1. PARTNERSHIP—*What Constitutes—Profits—Losses.*—In order to consti-
tute a partnership it is necessary that there shall be an agreement that
something shall be attempted with a view to gain, and that this gain
shall be shared between the parties to the agreement. There must
be an agreement for a division of profits arising from some predeter-
mined business engaged in for their common benefit. It is not essen-
tial, however, that there shall be an agreement to divide the losses of
the undertaking.

2. CHANCERY JURISDICTION—*Adequate Remedy at Law—Partnerships—
Case in Judgment.*—The remedy at law is not adequate for the settle-
ment of partnership accounts, and any partner may file his bill in
equity for the settlement of the same. The evidence in the case in
judgment shows a partnership between the parties, and that the ap-
pellant had no right or power to deprive appellee of his share of the
profits of that partnership.

Argued at Richmond.    Decided at Wytheville.

Appeal from a decree of the Chancery Court of the city
of Richmond, pronounced April 6, 1894, in a suit in chan-
cery wherein the appellee was the complainant, and the
appellant was the defendant.

*Affirmed.*

The opinion states the case.

*W. W. & B. T. Crump*, for the appellant.

*Leake & Carter*, for the appellee.

CARDWELL, J., delivered the opinion of the court.

This is an appeal from a decree of the Chancery Court of Richmond city, and the case grows out of the following agreement:

"This agreement, made and entered into this 2nd day of Nov., 1889, between Merriwether Jones, of the first part, and S. S. Murphy, of the second part.

"Witnesseth: That the Clover Hill mines and mining property, and [the] land of the late Franklin Stearns, both situated in Chesterfield county, Virginia, have been put upon the market; and the parties to this agreement have agreed that each shall use his best endeavors to sell the said lands, as a whole or in part, and that each of the parties hereto shall receive one-third of the money or other consideration paid, or to be paid for said property above the actual cost paid to the owners, either as a profit or as commissions. The remaining third is hereby agreed to be paid to, James R. Werth, Esq. The necessary traveling expenses are to be deducted out of the net consideration or profits.

(Signed) MERRIWETHER JONES.

S. S. MURPHY."

The averments of the bill filed by Murphy against Merriwether Jones and James R. Werth, after referring to the above agreement, are substantially as follows:

That, while the said Werth's name is not affixed to this agreement, he not only knew of and consented thereto but allowed and encouraged complainant and Jones to act under the same, and acted under the same himself, and, as complainant believes and charges, agreed in writing, signed by him, as well as orally, to be bound by the terms thereof, &c.; that sometime before this agreement was entered into, complainant had made and faithfully carried out an agreement with Jones to divide the profits arising from sale of lands,

though nearly all the labor and expense had fallen on complainant's shoulders, &c.; that as soon as the contract of November 2, 1889, above quoted, was executed he (the complainant) set to work diligently to try to sell the lands named therein, or a portion thereof, and succeeded in interesting in the land a northern man, F. C. Dininy, Jr., whom he turned over to his partner in the contract, Jones, who remained in Virginia while complainant remained in the north; that after some negotiations and delays between Jones and Dininy and Werth, of all which complainant was kept advised, and about which he constantly advised and was consulted by letter, Dininy purchased a portion of the land at and for the price, as complainant was informed by Jones, of $55,000.00, and that the owner only received $25,000.00 therefor, thus making a profit of $30,000.00, less some small deductions, to be divided between complainant, Jones, and Werth in equal portions; that Jones claims that after this agreement with Dininy, the amount of profits was further reduced by other expenses and purchases, but admitted, as complainant believed, a profit of some $25,000 from this transaction alone; that complainant not only assisted in the sale to Dininy but had, in the negotiations and interviews with him, in New York and elsewhere, in relation thereto, contributed his time, skill, and labor to effect the sale.

It is further averred that Jones, or Jones and Werth, had put $5,000.00 of the profits thus realized in an option on some other of the land mentioned in the agreement of 1889, which will not expire for a year or more—said $5,000.00 to be treated as part payment on the land if the option is closed; that complainant expended money in traveling expenses under the terms of the contract of November, 1889, and not only procured the said Dininy, the purchaser, but continuously in season and out of season, in New York, New Jersey, and afterwards in Colorado, where he went before the sale to Dininy was concluded, endeavored to sell the balance;

or some portion of the balance, of the land mentioned in the
contract, other than that sold to Dininy, &c.; that thus com-
plainant continued to do until early in June, 1890, when he
was given to understand by the receipt of two letters, one
from Jones and the other from Werth, both, as complainant
believes, written after Dininy had paid the larger part of
the purchase money for the land bought by him, and cer-
tainly written long after he had paid a portion of the same,
that they had decided to eliminate complainant not only
from all further and future interests in the partnership
agreement of November, 1889, but had determined to forfeit
and confiscate complainant's one-third share in the profits
on the sale made to Dininy, and giving him to understand
that nothing was coming to him at all for past labor and ex-
penses, or for future efforts, although complainant had ever
been ready and willing to carry out for the future his agree-
ment, they still refused to account to him for his share of
the profits that they had already received on the sale to
Dininy, &c.

Jones and Werth filed their separate demurrer and answer
to this bill, and in their answer set up as a defence against
the claim asserted by Murphy, that Murphy, after the above
agreement was made, had left Virginia and abandoned the
agreement, or had failed, when required to do so, to put up
his share of certain moneys needed to effectuate the sale
made to Dininy. The demurrer was overruled, and the
cause was referred to a commissioner who made a report of
the transactions between these parties showing the amount
due to Murphy from Jones and Werth to be $7,231.17. Ex-
ceptions were filed to the report by the plaintiff and the de-
fendant Jones, but were overruled, and the report of the
commissioner confirmed, and the decree, which is appealed
from, after reciting that the plaintiff admitted that he had
received satisfaction from James R. Werth, for the one-half
of the profits of the plaintiff received by Werth in full of

all claims against Werth, decreed that Jones pay to Murphy the sum of $3,615.58, with interest thereon from the 10th of July, 1890, till paid, and one-half of his costs by him expended in the cause.

The demurrer raised the question of equity jurisdiction only, and appellant insists that the demurrer should have been sustained on the ground that the complainant's bill did not make a case for equity jurisdiction. We are of opinion that the demurrer was properly overruled, as the bill upon its face shows that the agreement under which the parties had acted made them partners; that there were partnership accounts between the parties which were properly to be stated and settled by a court of equity, and that the remedy of the complainant was not complete at law.

In order that persons may be partners in the legal acceptation of the word, it is requisite that they shall share something by virtue of an agreement to that effect, and that that which they have agreed to share shall be the profit arising from some predetermined business engaged in for their common benefit. An agreement that something shall be attempted with a view to gain, and that the gain shall be shared by the parties to the agreement is the grand characteristic of every partnership, and is the leading feature of nearly every definition of the term. 1 Lindley on Partnership, p. 1; Story on Part., sec. 2; *Duvos & Co., v. Hoover &c.,* 25 Fla. 727; *Lengle* v. *Smith,* 48 Mo. 276; *Cothran* v. *Marmaduke & Brown,* 60 Tex. 370.

In the last named case it was said that it is not essential to constitute a partnership that the parties are by agreement to share in the losses of the business; it is sufficient if they are to have a community of interest in the profits as such, and that where a party to the agreement was entitled to an interest in the profit this would entitle him to an account to ascertain the result of the enterprise.

In the case of *Lengle* v. *Smith, supra,* the parties entered

into an agreement by which the one was to furnish the capital and the other his services, the profits to be divided between them, and no special contract was made as to the losses, and it was held that they were partners, and that a court of equity was the proper court for either party to apply to for a settlement of the partnership accounts.

In the case here the agreement between the parties contemplated and provided for the selling on commission, or the purchase and sale at a profit, of several tracts of land (eight of which were in fact sold to Dininy), which agreement was indefinite in its continuance, the deduction from the net profits, whether these consisted of money or land, of the expenses of the parties, and the division of these net profits thus arrived at, into three equal parts, one of which was to go to Jones, one to Murphy, and one to Werth. These lands were not to be sold all at once, but could be sold, as they were, part at one time and part at another. It provided, in fact, for a series of transactions, involving expenditure of time, skill, and expense by the parties. The parties to the agreement being partners, and the bill showing that of necessity there were accounts to be taken to ascertain the result of the enterprise, the remedy of the complainant was only complete in a court of equity.

In the case of *Smith* v. *Marks*, 2 Rand. 452, this court said: "The principle of interference is, that courts of law either cannot give a remedy, or cannot give so complete a remedy as equity."

The evidence in this case consists of a long correspondence between the parties, especially between Jones and Murphy, and the depositions of the parties themselves, and it discloses that, at the time of the agreement above set forth, Werth held an option on the Stearns property, consisting of a number of tracts of land situated in Chesterfield county, and on other property in that county, which option expired in March, 1890, and that Werth had engaged Jones to assist

him in making sale of these properties, they agreeing to divide the profits equally. But Jones, considering himself unequal to the task, sought Murphy (who had been largely instrumental in making a sale of other valuable mining property which Jones had in hand, whereby Jones and Murphy had made considerable profit), and requested Murphy to agree to come into the arrangement with Werth; and, Murphy agreeing, the contract of November 2, 1889, was, after obtaining the assent of Werth, entered into. That immediately thereafter Murphy set to work to find purchasers for these lands, and a short time thereafter met Dininy and interested him in the Stearns property, carrying him over the property, &c., and brought Dininy to Richmond and introduced him to Jones. Negotiations between these parties looking to a purchase of at least a portion of the lands covered by the option were commenced and continued until finally ending in a sale of eight of the parcels of land, aggregating 2,674 acres to Dininy at the price of $55,000.00. It appears, however, that Jones obtained a new option from Stearns on February 8, 1890, the option held by Werth having been abandoned by Werth, the terms of this option giving Jones sixty days within which to purchase the whole of the Stearns property at the sum of $50,000.00, or the parcels of land that were afterwards sold to Dininy, for the sum of $30,000.00—$25,000.00 to be received by Stearns for the eight parcels of land, and the $5,000.00 remaining to be also paid to Stearns to be applied on the purchase money for the remaining tracts, and upon the payment of the sum of $30,000.00, Stearns was to convey the said eight tracts of land to Jones. Immediately upon obtaining this option from Stearns, Jones gave to Dininy an option on the eight parcels of land at the price of $55,000.00—$40,000.00 to be paid in cash, and the balance in one and two years, the consideration of the option paid by Dininy being $1,000.00, and to expire at sixty days. In fact, this agreement with Dininy was made on the 27th January, before

the written option was entered into on February 8th, and it also clearly appears that Jones knew or supposed when he made the agreement with Murphy, November 2, 1889, that he could get options from Stearns as he chose, and the contract was made to cover the sale of these lands, in whole or in part, whenever made by the joint efforts of Murphy and Jones. At all events, it had not at that time occurred to Jones that Murphy was not interested, for in addition to the fact plainly appearing in the record that Jones had given Murphy to understand that after he had turned Dininy over to him, he (Murphy) could leave him in his hands, Jones, on January 28th, the day after the agreement with Dininy was made that resulted in the sale to Dininy, wrote Murphy a letter in which he says: "I enclose you copy of contract made with Mr. Dininy yesterday. By this, as soon as D. pays the $40,000.00, we will have $10,000.00 to divide, each getting a third. * * * * * * * * * Now, go to work and get English syndicate to buy Brighthope and 1,300 acres Stearns tract for not less than $100,000.00, and say to them that it is now paying $10,000.00 on that amount." Up to this time no suggestion was heard from Jones that Murphy had forfeited his interest in these transactions by going to Colorado where he was engaged in some work in the line of his regular business, but continually corresponding with Jones and other parties in furtherance of the effort to sell the land they had in hand, and on the 27th of February, 1890, Jones writes Murphy a most encouraging letter as to the prospects for Dininy taking the land upon which the option had been given him, and winds up by saying, "So you see there is nothing to do now but wait to see what he (Dininy) is going to do." All through the correspondence it fully appears that these parties were in perfect accord until the sale to Dininy was consummated, when it seems to have occurred to Jones that he could deprive Murphy of his interest in the profits realized therefrom, even though these

profits were then to be divided equally between him and Werth. The option given to Dininy expired by limitation on April 8, 1890, but, by agreement, it was continued to May 8, 1890. In the meantime Dininy wrote to Jones on the 16th of April, asking him " to ascertain from his parties whether they would be content to change the option from $40,000.00 cash to $20,000.00 cash, the balance of the $55,-000.00 to be paid in thirty and sixty days, they to include in their deed another piece of land known as the " Red Russia," and saying that he would explain to Jones why. But instead of Jones immediately informing Murphy of this request from Dininy, and it was only a request, he waited until the 29th of April, when he wrote Murphy a letter which was received by Murphy in Pueblo, Col., on the 4th day of May, 1890, just four days before the option expired, informing him that Dininy had "*practically agreed to pay* $17,-500.00" on 8th of May, and that he was to get an additional tract of land—the " Red Russia" tract—costing about $1,000 more, and that it was necessary under this change in the contract for Jones, Werth, and Murphy to raise $12,000.00 in cash, and asking Murphy to send on $4,000.00, and, if he did'nt have that amount that "*possibly*" he (Jones) could get his (Murphy's) note at thirty days for that amount discounted. This letter also says " this has just been sprung on us, and we cannot at this stage of the deal refuse." The letter does not say, as will be observed, that Dininy had agreed to this modified contract, but " practically agreed," and does not say that the failure of Murphy to send the $4,000.00 or his note therefor is to result in the loss to him of his interest in the contract. To this letter Murphy replied asking for more definite information, and saying that he had no means of raising $4,000.00 on such a short notice or of paying it back if he could, and, drawing the conclusion, doubtless, from Jones's letter, said " D. seems to be a slippery fellow. What assurance have you that he won't ' fly

the track' again, as you say 'he has practically agreed to pay on 8th of May, &c.' * * * * * Is it not rather risky to raise money on a simple statement of any man ? If $12,000 must be raised, it, in common business prudence, should be done only on the backing of a strong contract with him with good security. * * * * * * *''. This letter was received by Jones on May 9, 1890, and in the meantime on May 8, Dininy paid with his check $17,500.00 in cash, and executed his note for $20,000.00, payable to his own order at thirty days; and another note for $15,000.00 payable in sixty days, and Jones and Werth had taken their note for $12,000.00, and with the $17,500,00 and the two notes of Dininy put up as collateral obtained from the Citizens Bank of Richmond the funds with which to pay to Stearns the $30,000.00, to which he was entitled from the sale of the lands to Dininy. A deed was made by Stearns to Jones for these lands, and another by Jones to Dininy for the land, and both deeds also deposited with the Citizens Bank as collateral security for the note of Jones and Werth and the two notes given by Dininy, and the deeds were not to be delivered to Dininy till both of his notes were fully paid. On the next day, May 9, Jones wrote Murphy acknowledging the receipt of his letter of May 5, saying: "I am sorry you did not feel as I did. There was nothing else for me to do but raise the $12,500.00 in cash, and also to contract to pay Stearns $19,150.00 additional on the remainder of his interests. Of course, we were obliged to hypothecate our entire interests to raise this money, or else the deal would have fallen through. I am in this position, that I can get $2,000.00 for your interest. The other parties will assume your proportion of the responsibility, and pay up what you now owe here. If you want to draw out you can draw on me at three days' sight for $2,000.00, with our original contract of November 2, attached, with your assignment of your interest *to blank* on the back of the paper. If you

are unwilling to sell out your chances to *bold parties*, then you must assume your share of the obligation, which I have assumed over my name, and you must send me your notes for one-third of $12,500.00 at thirty days, and one-third of $19,150.00 at two years, with five per cent. interest added, and I can then carry through the deal. Please wire me your answer at once. The deeds are all in escrow. If Dininy don't come to time, we will have the property to pay our notes with. * * * * * * * * *."

This letter is far from being candid. It utterly fails to disclose the real situation. It does not tell of the real transaction with Dininy. Perhaps, if it had, Murphy would have readily agreed to execute his note, as the result showed that he would have run no risk in doing so, and Jones ran none, and did not have one dollar to raise that was not realized from the cash and the notes received from Dininy—Dininy having paid promptly his note, and the first falling due in ample time to meet the note given by Jones to the Citizens Bank. These are the conditions upon which Jones seeks to deprive Murphy of his interest in the profits realized, in part at least, from the energy, skill, and effort of Murphy, and he seems to have had himself serious question as to his right to thus deprive Murphy of his interest in these profits, for we find upon the examination of the record that the " *bold parties*" to whom Jones in his letter to Murphy refers as being willing to give Murphy $2,000.00 for his interest and assume his proportion of the responsbility, &c., is no other than Jones himself. On cross-examination of Jones, he was asked who it was that he had gotten to agree to pay Murphy the $2,000.00 and assume his responsibility, &c., and his answer was that Mr. Werth had said if Murphy would return any contract he had with him that he would take them and pay $2,000.00 for them, but that he did not wish to be known in the transaction. This statement is not corroborated by Werth, who testifies in the case, nor in any way by the record,  Upon a

Opinion.

disclosure of all the facts in the case, Werth paid to Murphy that portion of the profits realized in the transaction with Dininy received by him, and to which Murphy was entitled, and we are of opinion that the decree of the Chancery Court requiring Jones to pay to Murphy that portion of the profits received by him in this transaction and claimed by Murphy, is right, and it must be affirmed.

*Affirmed.*