## Staunton.

WILLIAMS V. KENDRICK.

September 13, 1906.

1. PARTNERSHIP—*Action for Share of Profits—Statute of Frauds.*—A contract of partnership for dealing in an option in coal lands is not within the statute of frauds so as to prevent recovery by one partner from the other of his share of the profits.

2. PARTNERSHIP—*Action for Profits—Illegality of Partnership—Case at Bar.*—An action cannot be maintained by one partner against another to recover a share of the profits of an illegal partnership where the illegality of the contract of partnership appears from the evidence in the case. In such case the maxim *ex turpi contractu non oritur actio* applies. In the case at bar the plaintiff and defendant agreed to obtain an option on certain coal lands through an agent of the owner of the lands, and to share the profits on a sale of the lands. By the promise of a share in the profits the agent was induced, in violation of his duty to his employer, to procure a favorable option, and the lands were sold by the defendant at a profit.

   *Held:* The profits of the partnership being the direct fruits of an immoral contract, the plaintiff cannot recover his share from the defendant.

Error to a judgment of the Circuit Court of Tazewell county, in an action of assumpsit. Judgment for plaintiff. Defendant assigns error.

                                    *Reversed.*

The opinion states the case.

*Henry & Graham,* for plaintiff in error.

*Chapman & Gillespie* and *A. S. Higginbotham,* for defendant in error.

KEITH, P., delivered the opinion of the court.

This is an action of assumpsit brought by Kendrick against Williams. The declaration contains three counts, the second of which is not relied upon. The first consists of the general counts in assumpsit; and the third states the special contract upon which the plaintiff expects to recover, and sets forth that the plaintiff and defendant agreed to obtain, through one Hubert Raven, an option contract from the Clinch Valley Coal and Iron Company for the purchase of certain real estate on Indian Creek in Tazewell county, and it was agreed that if a sale of the land could be made during the continuance of the option the plaintiff should have one-fourth of all the profits that the option was obtained in pursuance of this agreement; that the land was sold and a profit realized, amounting to $8,000, by reason whereof defendant was indebted to the plaintiff in the sum of $2,000, which he then and there undertook and promised to pay to the plaintiff, but, although often requested, has hitherto failed to comply with his promise.

Upon the trial the jury found a verdict for the plaintiff for $1,312.50, upon which judgment was rendered; and the case is before us upon a writ of error.

The errors assigned in the petition are: (1) That there was no contract between the parties; (2) that there was no sufficient consideration for the alleged contract; (3) that the original transaction between Williams and Raven having failed and fallen through, any possible connection Kendrick might claim therewith as a partner was ended; and an assignment of error with respect to the defense of the statute of frauds, which is

numbered six in the petition, but which really constitutes the fifth assignment. There are also assigned as errors the overruling of the demurrer to the third count, the giving of certain instructions, and the refusal to give other instructions.

Without going into details with respect to these assignments of error, we shall content ourselves with saying that the demurrer to the third count was properly overruled; that the rulings of the court with respect to instructions given and refused were in our judgment correct; that the evidence was sufficient to maintain the verdict of the jury with respect to the contract, its consideration and the existence of the partnership; and that the defense of the statute of frauds does not apply in a case such as this.

In *Howell* v. *Kelley* (Pa.), 24 Atl. Rep. 224, the Supreme Court of Pennsylvania held that "A partnership for dealing in options in coal lands is not within the statute of frauds, so as to prevent recovery by one partner from the other of his share of the profits."

This briefly disposes of all the questions raised except that which constitutes the fourth assignment of error.

After the testimony was closed the defendant asked the court to give the following instruction:

"The court instructs the jury that if they believe from the evidence that Hubert Raven was the agent of the Clinch Valley Coal and Iron Company, in charge of the land which was the subject of the option given by said company to sell said land or negotiate, in any way, a contract for the sale of said land for said company, and you further believe from the evidence that the plaintiff knew that said Raven was such agent with the aforesaid power conferred upon him by said company, and you further believe from the evidence that the plaintiff, with such knowledge, aided in inducing the said Raven to obtain the

option for the defendant, for $8.00 per acre, knowing or believ-
ing that the said defendant could sell the same at an increased
price, in which increased price the said plaintiff and Raven
would share, then the court instructs you that such arrange-
ment and agreement between the said plaintiff and said Raven,
and the agreement between the plaintiff and the defendant is
illegal as to the plaintiff, and cannot be treated by you as a
consideration, or any part consideration, for any contract be-
tween the plaintiff and defendant."

The defendant moved to have the verdict set aside, and insists
that the evidence, as applied to this instruction, ought to have
resulted in a verdict for the defendant.

It seems that Kendrick was a schoolmaster residing in Rich-
lands; that he was also a real estate agent; that he was ac-
quainted with W. R. Williams; that he learned that the Clinch
Valley Coal and Iron Company owned 3,000 acres of coal
lands lying on the waters of Indian Creek, which it desired to
sell at the price of $8.00 per acre; that it had given an option
upon this land at that price to one J. N. Harman, which option
was to expire early in October, 1901; that the plaintiff was ac-
quainted with Hubert Raven, who also lived in Richlands and
had charge of and looked after the lands of the Clinch Valley
Coal and Iron Company; that he had talked with Raven a good
deal and had been kept posted by him as to the expiration of
Harman's option; that Raven had gotten the option for Har-
man, and that Raven had told him on one occasion that the
Clinch Valley Coal and Iron Company had priced its lands at
$8.00 per acre, and that the company had promised him a com-
mission if he could find a buyer for the lands at that price, but
that the company had instructed him that he must make his
commission out of the buyer, if he could; and that Raven told
him that he was thinking of getting an option and trying to

handle the land himself, if Harman did not make a sale. Plain-
tiff further testified that he knew A. Cummins, who was a
dealer in coal lands and was buying for the Faraday Coal and
Coke Company; that he had bought lands on Beech Fork and
on Indian Creek, in Tazewell county, adjoining the lands of
the Clinch Valley Coal and Iron Company; that he believed
that this tract of land of the Coal and Iron Company could
be sold to Cummins; that he knew Charles P. Williams, a
brother of W. R. Williams, the defendant, who surveyed for
Cummins; that he had at one time thought of trying to get an
option on this land in his own name, but that on reflection he
thought it would probably be better to associate W. R. Wil-
liams, who, it was likely, could reach Cummins better; that
he had talked to Raven about Williams being a good man to
lay the proposition before Cummins; that on the day before the
Harman option expired he saw Raven, who told him that the
Harman option would expire the next day; that on the day of
its expiration he went to see Williams, the defendant, and
found him in front of his store in Richlands, and said to him:
"Doctor, let's you and I go in together and handle some coal
lands"; and he asked what lands, and plaintiff told him it was
the 3,150 acres of the Clinch Valley Coal and Iron Company,
that Harman's option was out that day, and said to him: "Doc-
tor, let's you and I go in together and get an option on that
proposition in your name; you go to Raven and tell him that
we will give him one-half of all the profits we may realize out
of the sale of these lands, and we will take the other half of
the profits; that is, you and I will divide the other half, or I
take one-fourth interest all around." The reply of Dr. Wil-
liams was "All right," and he said "Where is Raven?" Plain-
tiff says: "I looked down the street and saw Raven crossing
the street and said to Williams, 'Yonder Raven goes, go and

see him at once.' "᛫ That Williams·then followed Raven and overtook him and laid the proposition before him; that plaintiff remained standing in front of Williams' store, and when he had finished talking to Raven, Williams immediately came back and plaintiff asked him what Raven had said; that the reply was that it was all right, that Raven would get the option; that Raven wrote to the company and got the option, and it was sent in a few days duly signed by the company and in Williams' name; that it covered the lands that Williams and plaintiff had agreed to get an aption on and sell and divide the profits; that Williams then gave an option on the lands to George F. Brewster at $12.00 per acre for thirty days; that Brewster was the man who was getting options on coal lands for Cummins; that Williams agreed to pay Brewster $1,000 if the sale was put through in thirty days; that the sale was made to Cummins, and the Clinch Valley Coal and Iron Company made a deed to the Faraday Coal and Coke Company; that after Williams and plaintiff had made their agreement, plaintiff gave up his intention of securing an option on these lands in his own name, and afterwards made no effort to secure an option for himself; and that he considered himself bound to Williams by his agreement.

On cross-examination Kendrick said: "I had talked with with Raven about Williams being a good man to handle the deal . . . My reason for associating Williams with me in the deal was that he knew Mr. Cummins and his brother was surveyor for Cummins, and I thought that Williams could reach the proposed buyer better than I could"; but in response to a question by counsel for defendant, as to whether he had done anything by way of consideration and what he had done, witness stated that he had prepared Raven's mind in favor of Williams; that Raven seemed hostile to Williams and he used

his influence to reconcile Raven to Williams by telling Raven his reasons for thinking that Williams was the best man to put the deal through; and in response to a question by counsel for defendant as to whether Raven was the agent for the Clinch Valley Coal and Iron Company, and whether witness had knowledge thereof or not, he stated: "I knew that the company had about twenty or thirty thousand acres of land, and that Raven had charge of the lands of the company, and generally looked after the land about Richlands for the company, and kept trespassers off the land; and I knew that Raven had a lease on 8,000 acres of the company's lands about Richlands. If Raven was the agent of the company, I did not know it; I did not know what his powers or authority were. I knew that Raven had no power of attorney to sell the company's lands, and he could not sell the lands, nor give an option on the lands. But I knew that when an option was wanted, the parties would go to Raven, and that he would write to the company for the option and would recommend the parties who wanted the option."'

Raven's testimony is that having passed Dr. Williams and Kendrick, who were in conversation together, Williams followed him and asked him in regard to the option he had secured for Harman on the lands of the Clinch Valley Coal and Coke Company, and whether the option had expired or not, and he told him that it had; that Williams then asked him to get him an option on the land at $8.00 an acre, and he thought he could sell it for $12.00 an acre, and if so he would give him half the profits.

Now, according to the evidence of Kendrick, the whole conception was his; that he learned from Raven that the Harman option was about to expire, went to Williams and interested him in the matter, informed him of Raven's relations to the subject,

and outlined a contract by which he and Williams were to divide one-half of the profits, the other half of which were to be paid to Raven. Paid to him for doing what? He advanced no money; he rendered no service, and was of value solely because of the relations he occupied to the Clinch Valley Coal and Iron Company, for whom he was the manager, and by whom he was authorized to dispose of this land at $8.00 per acre, his compensation to be paid by the purchaser. Williams was brought in because he had a brother occupying a somewhat confidential relation to Cummins, who was acting for the Faraday Coal and Coke Company, to whom the land was to be sold. So that the partnership of Kendrick and Williams went into the transaction with a very reasonable expectation of a profit, seeing that they had friends in the confidence of both the prospective seller and buyer.

The learned judge of the Circuit Court, in speaking of this branch of the case says that he has no doubt of the turpitude of Raven, and that he was guilty of duplicity and double dealing with respect to his principal, the Clinch Valley Coal and Iron Company; but was of opinion that the evidence did not show that Kendrick had any knowledge of it. In his opinion the judge says: "There is only one fact that tends to show that Kendrick did have notice (and that speaks as loudly against Williams as it does against Kendrick)—viz.: The offer to give him such a large share of the profits; but the law does not presume fraud. The presumption is rather in favor of fair dealing, and two facts appear from the record which tend to explain this—one, Raven had told Kendrick that he was authorized to find a purchaser for this land at $8.00 per acre, and to get his commissions off of the other side if he could; the other, that Raven was thinking of getting an option himself after the Harman option expired."

It is true that the facts implicate Williams in whatever immorality may attach to the case; but Williams is not asking anything at the hands of the court. Williams merely invokes an established rule of law, and says to the court, it may be with ill-gotten gains in his hands: "You cannot compel me to disgorge at the instance of another party to this wrong, because I am protected by the maxim, *'Ex turpi contractu non oritur actio.'* "

There is no assignable motive for bringing Raven into the transaction and agreeing to pay him one-half of the prospective profits, except that he occupied confidential relations with the owner of the coal lands which were the subject matter of the contract. Kendrick went to him because of those relations. It is true that Kendrick says that he did not know that Raven was the agent of the Clinch Valley Company, or what his powers and authority were; that he knew he had no power of attorney to sell the company's lands or give an option upon them; but he admits that he knew that when an option was wanted the party would go to Raven. He knew that the company had authorized Raven to sell the land at $8.00 an acre, requiring him to look to the purchaser for his remuneration. It is certain from the whole case that the parties to this contract saw the end from the beginning; that they knew they could sell, or at least had a most reasonable expectation of selling, these lands at an advance of from three to four dollars per acre; and this knowledge was common to Raven, to Williams, and to Kendrick. Williams was reluctant to give Raven one-half; but Raven knew that he was a necessary factor without which the transaction could not succeed, and stood out for a contract which paid him one-half of the whole proceeds. His confidential relations to the Clinch Valley Coal and Iron Company rendered him, as we have said, a necessary factor in the transaction.

To seduce him from his allegiance to his employer, he was offered one-half of the profits that might accrue to the partnership, and those profits were the direct fruits of his treachery to his employer.

We fully approve the law as stated by the Circuit Court in its instruction and in its opinion.

In *Watson* v. *Fletcher,* 7 Gratt. 1, the syllabus is as follows: "A court of equity will not lend its aid for the settlement and adjustment of the transactions of a partnership for gambling. Nor will it give relief to either partner against the other, founded on transactions arising out of such partnership, whether for profits, losses, expenses, contribution or reimbursement.

Though the pleadings do not show that the transactions sought to be settled and adjusted arose out of a partnership for gambling, yet if this appears from the evidence taken before the commissioner who was directed to settle the accounts, it is proper for the court to recommit the accounts and direct an enquiry into the consideration on which the claims of the parties are founded."

In *McMullen* v. *Hoffman,* 174 U. S. 639, 19 Sup. Ct. 839, 43 L. Ed. 1117, it is said that in any action brought in which it is necessary to prove an illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights springing from such contract.

We are of opinion that the Circuit Court erred in refusing to set aside the verdict, and for this reason its judgment must be reversed and the cause remanded for a new trial.

*Reversed.*