## Wytheville.

MILLER v. FERGUSON AND OTHERS.

June 20, 1907.

1. PARTNERSHIP—*Purchase and Sale of Land—Statute of Frauds—
Evidence.*—A partnership for the sale and purchase of land for
speculation, the profits to be divided among the partners, is .valid
when verbally made, and the existence of the partnership and the
extent of the interest of the partners may be shown by parol.

2. PARTNERSHIP—*Good Faith—Disclosures—Case ·in Judgment*—The evi-
dence in this cause shows the existence of a partnership between the
appellant and the appellees to purchase a designated piece of real
estate for speculation, and ˙that, while the relations of the parties
called for the utmost good faith and fair dealing between them, the
appellees, after availing themselves of appellant's plan to acquire
the property, eliminated him as a possible competitor for it, carried
on negotiations behind his back, and withheld from him information
of the gravest importance, .vitally affecting his interest, and acquired
the property for themselves. Upon the plainest principles of equity
and fair dealing, the appellant is entitled to participate in the
profits arising from the transaction.

Appeal from a decree of the Circuit Court of Wythe county.
Decree for defendants. Complainant appeals.

*Reversed.*

The opinion states the case.

*Scott & Buchanan,* for the appellant.

*Robertson, Hall & Woods,* and *Robertson & Wingfield,* for
the appellees.

WHITTLE, J., delivered the opinion of the court.

In October, 1904, the appellant, Thomas W. Miller, entered into a parol agreement with two of the appellees, S. C. Ferguson and J. R. Terry, for the acquisition of 7.57 acres of land in the city of Roanoke, known as the "Miller Hill" property, upon the stipulations that the two latter were to supply the purchase money, and the land, when bought, was to be conveyed to one of the real estate corporations controlled by them, to be divided into lots and sold, and, after defraying expenses and refunding the purchase price with interest, the net profits arising from the sale were to be shared equally by Miller, Ferguson and Terry. Having obtained contracts for the purchase of the property, Ferguson and Terry denied Miller's right to participate in the profits, and procured the title to be conveyed to the Highland Company, Incorporated; whereupon, Miller instituted a suit in equity to establish the partnership agreement and enforce its provisions.

The defendants, Ferguson and Terry, demurred to the bill, and filed a plea of the statute of frauds; and also by separate answers, denied the existence of the partnership and liability on the agreement.

The circuit court overruled the demurrer and rejected the plea, but, on final hearing, dismissed the bill, and the plaintiff appealed.

We are of opinion that the preliminary question raised by the demurrer and plea was rightly decided by the trial court. The doctrine established by the weight of authority on the subject, both in England and in this country, is summed up in 29 Am. & Eng. Ency. L., pp. 897, 898, as follows: "It is well settled that a partnership for the purchase and sale of land for speculation, the profits to be divided among the partners, is valid when verbally made, and the existence of the partnership and the extent of the interest of the partners may be shown by parol."

The principle that the statute of frauds has no application to such an agreement, is placed by some of the leading cases

on the ground that when land is acquired and held for partnership purposes, it is considered personalty as between the partners and creditors of the firm, and also between the surviving partner and the representative of a deceased partner.

In the case of *Dale* v. *Hamilton,* 5 Hare 368, the court observes: "The plaintiff, however, has relied upon another ground for taking the case out of the statute. He says that when a partnership, or an agreement in the nature of a partnership, exists between two persons, and land is acquired by the partnership as a substratum for such partnership, the land is in the nature of the stock in trade of the partnership; and that the partnership being proven as an independent fact, the court, without regarding the statute of frauds, will inquire of what the partnership stock consists, whether it be of land or of property of any other nature." The court then, after reviewing the authorities, says: "The principle upon which I presume the above cases have proceeded, has been partly the jurisdiction of the court in cases between partners touching the partnership property, and partly its jurisdiction to relieve against the fraud of a partner, who should avail himself of his legal right in violation of his partnership contract, a fraud as against which no remedy, or no adequate remedy, could be had at law."

The decisions of this court are entirely in accord with the prevailing doctrine.

In *Pierce's Admr.* v. *Trigg's Heirs,* 10 Leigh 423, 439, the court observes: "I think then, the doctrine laid down in Gow on Partn. 51, and 3 Kent's Comm. 37, may now be taken as settled in England, namely, that real estate purchased for partnership purposes, with partnership funds, and used as part of the stock in trade, is to be considered to every intent as personal property, not only as between the members of the partnership respectively, and their creditors, but also as between the surviving partner and the representatives of the deceased." *Canada* v. *Barksdale,* 76 Va. 889; *Brown* v. *Brown,* 77 Va. 619, 629; *McCully* v. *McCully,* 78 Va. 159; *Taylor* v. *Taylor,*

88 Va. 529, 532; 14 S. E. 325; *Derring* v. *Kerfoot,* 89 Va. 491, 493, 16 S. E. 671; *Jones* v. *Murphy,* 93 Va. 654, 24 S. E. 825; *Williams* v. *Kendrick,* 105 Va. 791, 54 S. E. 865.

The case of *Jones* v. *Murphy, supra,* is identical in principle and strikingly analogous in its essential features to this case. It upholds the jurisdiction of the court of equity, and is likewise conclusive on the point that this class of contracts is not within our statute of frauds.

On the merits of the case, we have examined the entire evidence with much care, and it may be affirmed that it sustains the following findings: In October, 1904, the appellant, Miller, a lawyer who had established an office for examining and supplying abstracts of titles, entered into a partnership agreement with Terry and Ferguson, who were dealers in real estate, the latter being also a private banker and capitalist, for the purchase of the "Miller Hill" property, with the understanding that, in the event of a purchase, the price was to be paid by Terry and Ferguson, and the legal title lodged in one of the land companies under their control; that the land should be laid off in lots for sale, and the net proceeds, after refunding the purchase money and expenses, were to be equally divided among the three partners. It is true, that both in their answers and depositions the defendants insist that Miller (who, it is admitted, suggested the project, though the defendants say it had previously occurred to them) represented to them as a fact, and not merely as an expression of opinion, that he could buy the property at $6,000, and that his right to participate in the profits was predicated on his fulfilment of that assurance. The statement is, however, positively denied by Miller, and is not sustained by the testimony of the defendants. Miller did express the belief that the land could be secured at even less than $6,000; at the same time, he made full disclosure of the extent of his information and negotiations, which fully advised the defendants that he had agreed upon no price, and had acquired no contractual rights from the owners, and that his

declarations of value were nothing more than expressions of opinion and expectation. That fact not only appears from the deposition of Miller and the admissions of his adversaries on cross-examination, but from their conduct as well. Their joint efforts to acquire the property on the most favorable terms possible continued after it had become apparent that it could not be bought at the price indicated.

The land was located in the most desirable residential section of the city, but there were complications about the title which kept it vacant, while other property in the vicinity was being improved. In 1884 Mrs. Jane Lewis conveyed the land to a board of trustees, under the control and direction of the Virginia Conference of the Methodist Episcopal Church. Subsequently, the Freedman's Aid and Southern Education Society of the Methodist Episcopal Church, and the trustees of the Methodist Episcopal Church of Roanoke, Virginia, also became interested in the property. Thomas Lewis claimed and owned the right of reverter, which remained in the heirs of Jane Lewis, provided the property should not be devoted to the purposes contemplated by the original deed; and it was necessary to obtain the titles of these various claimants before a merchantable title could be acquired. The trustees had no authority to sell the property without the consent and direction of the Conference. Accordingly, for the purpose of securing favorable action in that behalf, it was arranged that Terry should attend the meeting of the Conference in March, 1905, and, through the medium of a friend, lay the matter before them. On March 18 a resolution was passed by that body, directing the trustees to sell the property at the best price obtainable. On March 20 Terry returned to Roanoke, and on the following day reported to his associates, Miller and Ferguson, that the Bishop, whom he represented as dominating the Conference, declined to sanction a sale for less than $20,000. To quote Terry's exact language: "I told them (his associates) that we had lost out, and related what had occurred. Mr.

Miller said he was sorry we had lost out, and Mr. Ferguson said he was glad we had not put any more money into the scheme." Terry and Ferguson concealed from Miller the passage of the resolution of March 18, while on that night, March 21, they met a committee of the trustees at Terry's residence and concluded an agreement with them for the purchase of the church's interest at $8,000. The next meeting of the parties was held in Ferguson's office, June 19, 1904, when Ferguson sent for Miller and informed him they had ascertained that the "Miller Hill" lot would cost $16,000—$8,000 for the church's interest and a like sum for Colonel Lewis's; and that he was unwilling to advance so large an amount and divide profits with anyone. It was, thereupon, agreed that if Miller would refund the amount expended by Ferguson and Terry, which was estimated to be $235, by 10:30 o'clock the next morning, they would abandon the enterprise in his favor; otherwise, Miller was to be considered "out of the deal." The defendants' version of what occurred is that, in addition to repaying the money expended, Miller also agreed to indemnify them against liability on the contracts of purchase. On the following morning, within the time limit prescribed, Miller repaired to Ferguson's office and tendered the amount agreed on, which Ferguson did not receive, but inquired, "Well, have you deposited the $16,000 in the First National Bank?" Miller insists that he learned of this condition that morning for the first time, and his statement is corroborated by the circumstances. It is admitted that Ferguson and Terry called on Col. Lewis on the morning of the 20th, and obtained a verbal option to purchase his interest at $8,000, so that indemnity against that agreement could not have entered into the compact of the previous day. Besides, subsequent events show that, if such terms had been imposed on Miller, he would have been willing and able to have complied with them. The parties chaffered over the new requirement until the time, 10:30 o'clock, had elapsed, when Ferguson closed the discussion with the declara-

tion that the time had expired and he could do nothing for him. Miller thereupon withdrew, and in less than an hour made arrangements to deposit the $16,000 and offered to do so, but was again informed by Ferguson that he was too late.

This outline of the salient points in the testimony shows that the conduct of the defendants can receive no countenance in a court of equity. The confidential relations arising out of the contract of partnership called for the exercise of the utmost good faith and fair dealing between the parties, in lieu of which it plainly appears that Ferguson and Terry, after availing themselves of Miller's plan and eliminating him as a possible competitor, carried on negotiations behind his back, and withheld from him information of the gravest importance, vitally affecting his interests. Under such circumstances, it is idle to attempt to conjure up imaginary equities in behalf of the defendants on the theory that they were compelled to pay a higher price for the property than was originally contemplated. They were absolute masters of the situation, and whenever the price reached a point which, in their judgment, rendered the purchase inexpedient, it was only necessary for them to have withdrawn from the venture. But it would be violative of the plainest principles of equity and fair dealing to permit them, after having voluntarily acquired the property, to exclude their associate from participation in the profits.

For these reasons, we are of opinion that the decree of the circuit court is erroneous, and must be reversed.

*Reversed.*