MAAS v. LONSTORF.

LONSTORF v. MAAS et al.

(Circuit Court of Appeals, Sixth Circuit. March 5, 1912.)

Nos. 2,132, 2,133.

1. JOINT ADVENTURES (§ 4*)—EXPLORATION CONTRACT—CONSTRUCTION.

Where defendant M., in order to obtain complainant's assistance in certain mining explorations, obtained complainant's consent to pay one-half of the exploration expenses, in consideration of which M. agreed that, in case he secured options on lands in the vicinity of the premises described, complainant should have one-third interest therein, such contract included options for purchase as well as options for lease, so that M. was not entitled to procure purchase options for purchase in his own name and for his sole benefit.

[Ed. Note.—For other cases, see Joint Adventures, Cent. Dig. §§ 3-6; Dec. Dig. § 4.*]

2. JOINT ADVENTURES (§ 4*)—RIGHTS OF TRUSTEE—INDIVIDUAL INTEREST.

Where defendant induced his aunt to furnish one-half the expense required to explore certain mining property with the understanding that she should have one-third interest in any options he should secure on the land, defendant owed her a fiduciary relation, and was estopped to claim that by merging lease options into purchase options on mining property he obtained and held the purchase options for his own benefit without any duty to account.

[Ed. Note.—For other cases, see Joint Adventures, Cent. Dig. §§ 3-6; Dec. Dig. § 4.*]

3. RELEASE (§ 17*)—TRUSTEE—SETTLEMENT—CONCLUSIVENESS—FRAUD.

Under the rule that the duty of a trustee to exercise the utmost good faith extends to the matter of obtaining a release from the beneficiary, where defendant M. obtained a release from his aunt, with whom he stood in a fiduciary relation, of all her interest in certain mining options in consideration of certain notes, she was not, under the circumstances of the case, concluded by the release from thereafter maintaining a suit for an accounting of her interest in the property.

[Ed. Note.—For other cases, see Release, Cent. Dig. § 32; Dec. Dig. § 17.*]

4. JOINT ADVENTURES (§ 4*)—RIGHTS OF PARTIES.

Where defendant M., while purchasing options on mining property for one-third of which he was bound to account to complainant, purchased outright an undivided interest in a particular tract with his own funds in order to use the same as a lever to obtain a lease option on the entire tract, and complainant in her bill for an accounting did not claim any interest in such property on the theory that there had been an actual purchase thereof by defendant, but alleged that defendant had acquired an option which he had transferred to the iron company with the other options in which she was interested, and as a part of the same transaction complainant, under the circumstances of the case, had no interest in the purchase of the option on the particular tract and could not compel an accounting with reference thereto.

[Ed. Note.—For other cases, see Joint Adventures, Cent. Dig. §§ 3-6; Dec. Dig. § 4.*]

5. JOINT ADVENTURES (§ 4*)—MINING OPTIONS—SALE—ACCOUNTING—ROYALTIES.

Complainant was entitled to one-third of certain mining options obtained by defendant and leased by him to an iron company. Defendant between the date of the execution of the lease and January 20, 1910, had

received in royalties $53,111, but of this $35,407.40 was received as royalties under the original terms of the lease; the remaining $17,703.70 being received under a supplemental agreement as to an increase in the royalties in consideration of defendant's transfer of one-half of his separate undivided interest in certain other property in which complainant was not interested and of his "good will." *Held*, that complainant was not entitled to share in any part of the royalties so received except the $35,-407.40.

[Ed. Note.—For other cases, see Joint Adventures, Cent. Dig. §§ 3–6; Dec. Dig. § 4.*]

6. JOINT ADVENTURES (§ 4*)—TRUSTEE—EXPENSES.

Complainant contracted to pay half the expenses of certain mining explorations in consideration of one-third of any options that might be obtained by defendant. Defendant employed his brother as an expert and confidential driller and agreed to pay him $80 a month in cash and one-fourth of his own profits in the venture, and thereafter defendant paid his brother $24,588 as his fourth of the profits. *Held*, that the settlement was beneficial to complainant and that she was properly charged in an accounting with her share of the reasonable value of the brother's services.

[Ed. Note.—For other cases, see Joint Adventures, Cent. Dig. §§ 3–6; Dec. Dig. § 4.*]

7. JOINT ADVENTURES (§ 4*)—TRUSTEE—ACCOUNTING—CLAIM FOR SERVICES.

In a suit for an accounting of complainant's interest in certain mining options, defendant was not entitled to an allowance for services rendered after the making of a lease under the options to an iron company, where no claim for such services was pleaded or included in the order of reference to the master, and where he claimed no credit therefor in a list filed by him before the special master intended to show the extent of his claim.

[Ed. Note.—For other cases, see Joint Adventures, Cent. Dig. §§ 3–6; Dec. Dig. § 4.*]

Appeals from the Circuit Court of the United States for the Western District of Michigan.

Bill by Margaretha Lonstorf against George J. Maas and another. From a decree in favor of complainant for less than the relief demanded, both Margaretha Lonstorf and George J. Maas appeal. Affirmed.

See, also, 166 Fed. 41, 91 C. C. A. 627.

In No. 2,132:

A. C. Dustin and Young & Bell, for appellant.

D. H. Ball and A. B. Eldredge, for appellee.

In No. 2,133:

D. H. Ball and A. B. Eldredge, for appellant.

A. C. Dustin (Hoyt, Dustin, Kelley, McKeehan & Andrews and Young & Bell, of counsel), for appellees.

Before WARRINGTON, Circuit Judge, and McCALL and SANFORD, District Judges.

PER CURIAM. This bill was filed for the purpose of compelling Maas, one of the defendants below, to convey to Mrs. Lonstorf, the complainant below, an undivided interest in certain mineral properties alleged to have been acquired by him as the proceeds of explorations

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

for iron ore conducted for the joint benefit, and to account for her proportion of the rents and royalties received therefrom. The Circuit Court, after a hearing upon the pleadings and proof, entered a decree requiring Maas to convey to her a one-sixth interest in the properties therein described and referring the cause to a special master for an accounting. An appeal by Maas from this decree was dismissed by this court on the ground that it was not a final decree, and the cause remanded for further proceedings. Maas v. Lonstorf, 166 Fed. 41, 91 C. C. A. 627. Thereafter the cause was heard on exceptions to the special master's report, and a final decree was entered describing the lands and mineral interests in which Maas was directed to convey a one-sixth interest to Mrs. Lonstorf, subject to a mineral lease made by Maas to his codefendant, the Cleveland-Cliffs Iron Company, together with an interest in a certain Race Course property not set forth in the interlocutory decree; adjudging that there was a balance due to Mrs. Lonstorf from Maas of $12,099.94; and decreeing that the Cleveland-Cliffs Company attorn to Mrs. Lonstorf as the owner of an undivided one-sixth interest in the lands covered by its lease and pay her one-third of all royalties accrued thereunder since January 20, 1910. From this final decree both Mrs. Lonstorf and Maas have appealed to this court; the Cleveland-Cliffs Company not appealing.

The main facts are these: Mrs. Lonstorf is a resident of Milwaukee, Wis. The defendant Maas is her nephew; his mother, Mrs. Maas, being her sister. Maas and his mother reside at Negaunee, Mich. In 1898 Mrs. Lonstorf and Mrs. Maas were each the owners of an undivided one-third interest in a valuable iron ore mine at Negaunee, known as the Negaunee mine, which was leased to a mining company under a lease which would expire in 1903. The defendant Maas being familiar with the ore formation and somewhat experienced in exploring for mineral properties, and believing that the drift in the Negaunee mine pointed to the northwestward, secured, at some expense in time and money, options for mining leases on two farms, known as the Corbit and Martel tracts, lying northwestwardly from the Negaunee mine, and the promise of a similar option on another tract. Subsequently, after a preliminary correspondence between Maas and George J. Lonstorf, the complainant's son, who acted as her agent in the matters involved in this suit, Mrs. Lonstorf and Maas on November 25, 1898, entered into a written contract which is the foundation of this suit. By the terms of this contract Maas assigned and transferred to Mrs. Lonstorf a one-third interest in the options for lease on the Corbit and Martel tracts, and in the leases of said premises, if taken, and agreed to give the benefit of his skilled labor and knowledge and the use of his drilling outfit in the exploration of said lands; Mrs. Lonstorf agreeing on her part to pay one-half of the actual expenses of exploring for iron ore on said premises. This contract contained the following clause, concerning which this controversy chiefly relates, namely:

"Said first party (Maas) further agrees in case he secures options on lands in vicinity of the above-described premises that said second party (Mrs. Lonstorf) shall have a one-third (⅓) interest therein."

Maas also made a similar oral agreement with his mother; but she is not a party to this suit, and her rights are not involved herein.

Under this contract Mrs. Lonstorf from time to time furnished moneys to Maas, as required, for her part of the expenses of the exploration. He proceeded diligently in the work, and placed at first a test hole on the line between the Martel and Corbit tracts, and, later, test holes on other lands more to the southwestward, as the tests indicated that the ore extended in a more westwardly direction from the Negaunee mine than at first supposed. In the light of these developments he took from time to time options for lease on various other tracts in the vicinity, and from time to time renewed various of the options. In March, 1900, he bought outright for $300 an undivided mineral interest in a tract known as the Race Course property. In October, 1900, however, instead of thereafter extending all the options for lease or endeavoring to obtain options for lease on other tracts which the explorations indicated to be desirable, he commenced to take options for the purchase of various tracts or mineral rights. In some instances these purchase options were taken at the expiration of the lease options on the same tracts, and in others, before such expiration; in some, at the same time with the renewal of lease options on the same tracts, and in others, on tracts on which he had not obtained lease options. On November 1, 1900, after taking some of these purchase options, he wrote Lonstorf, without mentioning that any purchase options had been taken, stating that he had decided to sell the exploration and asking authority to sell their lease options or the leases which they might take by virtue thereof, for not less than $300,000, to be equally divided between Mrs. Lonstorf, Mrs. Maas and himself; to which Lonstorf gave his mother's consent. Maas thereafter continued the taking of purchase options instead of lease options, including an option for the purchase of a part of the original Corbit tract, with an extension of the lease option on the entire tract, and an option for the purchase of a part of the original Martel tract, on which the lease option had expired.

In December, 1900, Maas visited Mrs. Lonstorf at her home in Milwaukee, and had various conversations with her, her son George, and another son. He had with him a map showing the various tracts on which he held options for lease and for purchase. Maas states that he pointed out to them the different properties on which he held these options and told her that he had increased the territory by getting a great many options for purchase, but that she and his mother "would share alike in the benefits of the lease from all these properties"; that if he sold he would add the properties he had for purchase to the other, and extend the scope of the lease they were interested in under the contract and treat it as if the lease covered all the properties; to which he states she made no reply and seemed to be satisfied. The weight of the evidence, however, as was found by the learned trial judge, is that Maas not merely pointed out the various tracts on which he held options for purchase and lease, but that he stated that while he could not continue to get lease options he would hold those which he had as a lever to force purchase options, and that

he referred to all the options for purchase and lease as "their" property, and stated that Mrs. Lonstorf was interested in all this property.

On January 14, 1901, Maas held purchase options on 11 tracts and mineral interests in the vicinity of the Negaunee mine, including portions of the Corbit and Martel tracts and other tracts on which he had previously held lease options, and two tracts, known as the Barabe and Stewart tracts, on which he also held lease options. He also held lease options on two so-called Cemetery tracts, on which he had no purchase options. Under his several purchase options the amount to be paid the various vendors in order to acquire the 11 properties aggregated about $290,000.

On this date, Maas, by written contract with the Cleveland-Cliffs Company, granted it an option, "not divisible," of purchasing and acquiring from him, within five months thereafter, an undivided half interest in the 11 options for purchase, with a mining lease from him on the other half interest in these properties, at a specified tonnage royalty and minimum annual royalty which were to be doubled after 2,000,000 tons had been mined. The consideration to be paid by the company, if it elected to purchase, was to be $600,000, plus such sum, not exceeding $10,000, as Maas might be required to pay for certain option extensions. Of this, $300,000, or so much thereof as necessary, was to be used in paying the original vendors the prices fixed under the eleven purchase options; the remainder to be paid to Maas in cash or in notes secured by mortgage. The deeds to the 11 properties were then to be taken in the name of Maas and the company jointly, an undivided half interest in each, and Maas was to lease his half interest therein to the company. This contract further provided that if the company should elect to purchase, Maas should, without further consideration, also assign and transfer to it his lease options on the two Cemetery tracts and release all claim thereto. Under this contract, however, Maas did not agree to sell the company any interest in the lease options on the Barabe and Stewart tracts, the purchase options on these tracts being alone mentioned; and these two lease options were subsequently allowed to expire.

It also appears that in the preliminary negotiations Maas stated to the officers of the company that he had options for lease for the benefit of his mother, his aunt, and himself, on certain of the properties on which he proposed to sell the options for purchase, and intended to give them the benefit of a similar lease on all the properties, and that he wanted to apply $300,000 of the purchase price to pay for such lease, or to get the land rid of these leases, as he expressed it; but the company declined to agree to his suggestion that the contract should separate the consideration and specifically appropriate $300,000 to the purchase of the lease. There is furthermore evidence that a mining lease on the Martel, Corbit, Stewart, and Barabe tracts alone would not have been worth more than $150,000.

Within a short time the company elected to purchase under its option from Maas. Out of $300,000 of the purchase price which it paid in money, $294,331.53 was used in paying the vendors under the 11 purchase options, and the balance, $5,568.47, paid to Maas, to-

gether with $11,429.01 to reimburse him for additional payments made to secure title. For the remainder of the purchase ·price, $300,-000, the company executed its notes. The several vendors delivered to Maas and the company, jointly, deeds to the 11 properties covered by the purchase options; and Maas delivered to the company a lease upon the undivided one-half interest thus acquired by him in these properties. As a supplemental transaction Maas also conveyed to the company a one-half undivided interest in his mineral interest in the Race Course property, and in consideration of this transfer and of his "good will," the company, in effect, agreed that pending the mining of 2,000,000 tons under its lease from Maas, both the tonnage royalty and the minimum royalty should be increased one-half; that is, should be at the rate of three-quarters of the royalties to be ultimately paid under the lease. It does not appear, however, that the company ever required Maas to assign to it the lease options on the Cemetery tracts; and apparently they were allowed to lapse.

The final result was that, as the outcome of these negotiations and through the sale of the 11 purchase options acquired primarily in consequence of the explorations undertaken for the joint benefit of Mrs. Lonstorf and Mrs. Maas and himself, Maas obtained an undivided half interest in these mineral properties, subject to the lease to the company, in addition to receiving a cash payment of several thousand dollars and the notes of the company for $300,000; and he also retained one-half of the mineral interest which he had acquired in the Race Course property.

After the company had elected to purchase, Maas notified Mrs. Lonstorf, through her son George, that he had induced the company to close with him, and that she would receive $100,000 in notes; and he subsequently sent her $100,000 of the notes which he had received, for which she executed to him a receipt reciting that this was "in ·payment" of her one-third interest in the "so-called Maas exploration" acquired by their agreement of November 25, 1898.

Subsequently, in October, 1903, Mrs. Lonstorf filed the present bill, which was framed upon the theory that the purchase options which Maas had sold the company were part of the exploration venture contemplated by their contract; that under this contract she was entitled to an undivided one-third interest in all the proceeds of the joint exploration, less one-half of the expenses; and that Maas had paid her one-third of only a ·portion of the proceeds, namely one-third of the notes, and had retained the remainder of the proceeds, namely, a one-half interest in the mineral properties which he had reserved under his dealings with the company, in which she was likewise entitled to ·an undivided one-third interest, subject to the lease to the company, as well as in the mineral interest which he had retained in the Race Course property. Maas, upon the other hand, in his answer, insisted that the joint exploration entered into under the contract was limited to lease options; that under the contract Mrs. Lonstorf had no interest in the purchase options which he had taken for himself independently of the contract; that though not legally bound thereto, in pursuance of verbal assurances to Mrs. Lonstorf that he would pro-

tect her in the one-third leasehold interest upon any lands in which he might acquire purchase options, he had in his sale to the company fixed upon the sum of $300,000 as the full value of such lease, and had treated the property as if it were incumbered with such a lease in favor of himself, his mother, and Mrs. Lonstorf, and had paid her one-third of the full value received therefor, namely, the $100,000 of notes, which she had accepted with full knowledge of the transaction; and he specifically relied upon the receipt above mentioned as a full settlement of all claims and demands on her part.

After careful consideration of the questions involved under these appeals, we have reached the following conclusions:

[1] 1. Without reciting the evidence, consisting mainly of correspondence, which is fully set forth in a careful and well-reasoned opinion of the trial judge upon the interlocutory hearing, we entirely concur in his conclusion, as did the judge who heard the cause upon final hearing, that the contract of November 25, 1898, was entered into not merely for the purpose of proving the ore deposits in the Negaunee mine and thus obtaining an extension of the existing lease on favorable terms, but also for the purpose of ascertaining valuable ore formations in the vicinity and acquiring control thereof by options for lease or purchase, to be held for the joint benefit of the contracting parties; that the provision of the contract that Mrs. Lonstorf should have a one-third interest "in options on lands" which Maas might acquire in the vicinity includes, by its terms, options for purchase as well as options for lease—in fact describing them the more aptly—and is not limited by the context to options for lease; and that the contract was furthermore, so construed by the parties themselves. And we are of opinion that upon the taking by Maas of the purchase options on ore properties in the vicinity, involving practically no greater expenditure than the taking of lease options, Mrs. Lonstorf became, under the contract, both by its express terms and as construed by the parties, the equitable owner of a one-third undivided interest therein, entitled to receive one-third of all the proceeds thereof upon paying one-half of the expenses incident thereto; and that her claim was not discharged by the transfer of one-third of the purchase-money notes merely, but that she was also entitled, in equity, to a one-third interest in the mineral properties which he also received as part of the proceeds of this joint venture, subject to the lease executed by him to the company, and to be substituted with him as a joint lessor in said lease to the extent of a one-third undivided interest.

[2] We furthermore concur in the opinion of the learned trial judge that even if under the contract Mrs. Lonstorf had been interested only in lease options, the relation of Maas to her, whether it be one of partnership, joint venture, or agency, forbade him to so act that his personal interest would be hostile to her, and that the course taken by him in merging lease options into purchase options which he claimed for his own benefit, and seeking to determine what part of the profits belonged to the joint enterprise and what part to himself, is one forbidden by his fiduciary relation and which equity will not tolerate. The greater weight of the evidence shows, in our opinion, that he al-

lowed lease options to expire, failed to obtain other lease options, and acquired purchase options in lieu thereof, in consequence of the information which he obtained through the joint exploration and largely by the use of the lease options, admittedly held on the joint account, as a leverage by which he sought to obtain purchase options for his own benefit. Clearly such course of dealing renders him liable to Mrs. Lonstorf, as a trustee, to the extent of one-third of the entire proceeds realized by him. It is well settled that an agent or other person sustaining a fiduciary relation to another cannot deal on his own account with the subject-matter of that relationship, or acquire an interest therein adverse to the one whom he represents, or make use of the knowledge which he acquires in the course of such agency or fiduciary relationship for his own benefit and to the injury of the trust; and that upon so dealing, he will be held, in equity, as a trustee of the person represented and compelled to transfer to him the property and benefits which he has thus obtained. Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764; Dennis v. McCagg, 32 Ill. 429; Davis v. Hamlin, 108 Ill. 39, 48 Am. Rep. 541; Vattelle v. Tedens, 122 Ill. 607, 14 N. E. 52, 3 Am. St. Rep. 502; Fricker v. Improvement Co., 124 Ga. 165, 52 S. E. 65; Forlaw v. Naval Stores Co., 124 Ga. 261, 52 S. E. 898. And see Warren v. Burt (8th Circ.) 58 Fed. 101, 7 C. C. A. 105; McKinley v. Williams (8th Circ.) 74 Fed. 94, 20 C. C. A. 312; Ludington v. Patton, 111 Wis. 208, 229, 86 N. W. 571; Mitchell v. Reed, 61 N. Y. 123, 19 Am. Rep. 252; and Goodhue Warehouse Co. v. Davis, 81 Minn. 210, 83 N. W. 531. In Kimberly v. Arms, supra, in which it was held that where two persons had entered into a partnership for the purchase and sale of minerals and mining lands, one of the partners who had acquired for his own benefit and at his own expense certain shares of stock in a mining company, was accountable in equity to his partner for a one-half interest in the stock so purchased, the court said (page 528 of 129 U. S., page 361 of 9 Sup. Ct. [32 L. Ed. 764]):

"Neither by open fraud nor concealed deception, nor by any contrivance masking his actual relations to the firm, can a member of it, or an agent of it, be permitted to hold to his own use acquisitions made in disregard of those relations, either as partner or agent."

The position taken by Maas that since the entire consideration received from the Cleveland-Cliffs Company was paid for the purchase options of which he claimed to be the sole owner, he was under no legal obligation to account to Mrs. Lonstorf for any portion of the proceeds whatever, but that in consequence of a previous oral assurance that he would treat the entire property as if it were incumbered with an option for lease in favor of his aunt, his mother, and himself jointly, he apportioned $300,000 of the amount received for his purchase options to such imaginary lease, and fully discharged Mrs. Lonstorf's claim by giving her one-third thereof, clearly shows, we think, the fallacy of his contention that upon undertaking joint explorations of this character for the benefit of himself and them, contemplating on his theory, the acquisition of lease options merely, he could so deal with the result of these explorations and the information which he

received as to gradually substitute for the valuable lease options, in which they were jointly interested with him, purchase options of which he was the sole owner, and leave them in a position where they had no legal right whatever in the proceeds and must remain content with such portion only of the profit of the joint exploration as he might deem proper to concede to them as a matter of grace. Furthermore, while he may have had in mind the idea of setting apart $300,000 of the proceeds as representing the value of such imaginary lease on the property, no such lease in fact existed or was transferred to the company, and no such apportionment of the purchase price was or could have been made between him and the company. And even if the company could be considered as having paid him $300,000 for his lease upon a half interest in these properties, this obviously could not be treated as the equivalent of the imaginary lease of which he states he agreed to give Mrs. Lonstorf and his mother the benefit, since this was a lease upon half of the property merely, and obviously not the equivalent of a lease upon all the property.

[3] 2. Upon the question whether Mrs. Lonstorf is prevented from asserting her rights to a full one-third in the proceeds of this venture by the receipt which she executed to Maas on receiving one-third of the notes, we have had greater doubt. The main facts are these: On November 1, 1900, he wrote Mrs. Lonstorf's son that he had made up his mind to sell the exploration and was going to demand $600,000, but would not sell for less than $300,000, and requesting authority from Mrs. Lonstorf to sell their options for lease or the leases which they might take by virtue thereof for not less than $300,000; which authority was given. On December 15, 1900, he wrote that he had been negotiating with different parties and had come down to $400,-000; and on January 9, 1901, that the Cleveland-Cliffs Company "will have to pay us by June 1st, if they take property $300,000." On January 17, 1901, he wrote that he had given the Cleveland-Cliffs Company an option, and inclosed the proof of an article which was to appear the next day in the Iron Herald, which stated that Maas, having some months before secured "options upon the mineral right of land" owned by the various designated persons whom he then held the options for purchase, and on the Cemetery tracts, had given an option to the Cleveland-Cliffs Company, and that it was understood that the money to be paid the several fee owners under the Maas options approximated $250,000, to which must be added the amount of his expenses and any profit he might make; but which contained nothing to suggest that under the option to the company Maas was to reserve any interest in the fee of the lands. On March 5, 1901, he wrote Lonstorf that the company had closed with him, and that Mrs. Lonstorf would receive $100,000 in notes secured by mortgage, and requesting that he send on the contract of November 25, 1898. Two days later, Lonstorf, on a visit to Negaunee, accidentally saw an article in the Marquette Mining Journal which recited the fact that it appeared from a lease from Maas to the Cleveland-Cliffs Company, which had been filed, that Maas had retained a half interest in the lands he had purchased from the other owners, and that the company had bought a half interest in the properties, with this lease from Maas.

After reading this article, Lonstorf had a conversation with Maas on the subject while riding on the train from Negaunee to Marquette. They agree that in this conversation Lonstorf asked Maas if the statement in the Mining Journal that he had received a half interest in the fee of the property sold the company was true, and that Maas said it was. Lonstorf testifies that he then said he thought they ought to have an interest in the fee, which Maas denied; and that this was the only talk. Maas testifies that Lonstorf said he understood Maas should not have any more interest than Mrs. Lonstorf, and did not think it was right, to which he replied that the purchase options were his own private property to do with what he wanted to; that he saw fit in making the deal to extend the scope of the lease so that they could get the benefit of these purchase options, and they got a greater price than they ever would have gotten if he had not gotten purchase options, and he thought he had treated his aunt and mother very fair; to which Lonstorf answered that he did not think it was gentlemanly at all, and he replied that he did not want to have any more words about it. It does not appear that in this conversation Lonstorf either asked Maas to see the contract with the company or inquired as to any particulars of the sale. That evening Lonstorf returned to Negaunee and saw Mrs. Maas, and told her that his mother was entitled to a third of what was received, and he would send his mother up to Mrs. Maas and let them settle. On learning of this interview, Maas, on March 13, 1901, wrote Lonstorf a letter in which he said:

"I want to say right here that under no circumstances will I allow my mother to worry herself or discuss my business with your mother or with any one else. Neither will I discuss my business nor will I quarrel with your mother or with you or anybody else over this matter of my fee. What I have to say will be written in this letter and that will end it from my part. I sold the fee and lease separately and sold the lease for the sum stated in the option from your mother to sell. The fee I acquired for my own benefit, paid all the expenses and lawyer fees in doing so myself, and never expected anybody to question my right in doing so. Every offer I made to sell the property was fee and lease separated and the first price of lease was $600,000.00. I came down to $300,000.00. * * * I thought I was doing a generous act in extending the scope of the lease, and getting the property in shape to handle. That I kept my private dealings to myself is my own affair. I wish to state again I will not allow my mother to discuss this affair with your mother, neither will I discuss it any more and what I have written must suffice."

In reply Lonstorf, on March 15, 1901, wrote Maas that "my mother will not bother you or your mother regarding the matter you refer to," requesting him to send him the mortgage and an assignment of a one-third interest therein, so he might have his attorneys look over them, and stating that when the notes arrived he would go to Negaunee to settle up with Maas, "or if you can get $100,000 cash the same will be acceptable." After writing this letter, Lonstorf appears to have made no effort to ascertain the precise facts, and a few weeks later, on receiving from Maas the $100,000 in notes, Mrs. Lonstorf, upon the advice and with the consent of her son, executed and sent him a receipt therefor, containing the clause:

"In payment of my one-third interest in the so-called Maas explorations, which was acquired by certain agreement dated November 25, 1898, copy of which is hereto attached."

It also appears that at and previously. to this time Maas was, and had been, actively engaged in endeavoring to secure an advantageous renewal of the lease on the Negaunee mine in which Mrs. Lonstorf and Mrs. Maas each owned a one-third interest, and had been corresponding with her son in regard thereto, and we think it fairly inferable that the principal motive which induced Mrs. Lonstorf to then accept the notes and sign this receipt, without further information than she then possessed, was the desire to preserve friendly relations with Maas in order that nothing might occur to lessen the chance of an advantageous renewal of the Negaunee lease.

We are of the opinion, in the first place, that the statement, in Maas' letter of March 13th, that he "sold the fee and lease separately and sold the lease" for $300,000, was not intended by him or understood by Lonstorf as meaning that he had actually sold any fee or any lease, but that the meaning which Maas intended, and which Lonstorf understood, was that he had sold separately the purchase options and lease options, and had sold the lease options with an extension of their scope, for the sum of $300,000. This is clearly shown by the pleadings, since in the bill Mrs. Lonstorf alleges that Maas reported to her "that he had sold the options for lease for the sum of $300,000," and Maas, in his answer, specifically admits that in connection with the balance of the transaction "he informed complainant that he had sold the options for lease for the sum of $300,000." Giving, then, the statement in Maas' letter this construction, it is evident that it misrepresented the actual facts of the transaction. In fact, Maas had not sold the purchase options and lease options separately; nor had he sold any lease options for $300,000, or any other sum. In fact, he had sold the purchase options alone, for a little more than $300,000, plus a half interest in the fee of the properties, and had merely set apart in his own mind $300,000 of the proceeds as representing the value of an imaginary lease on the properties the joint benefit of himself, his mother, and Mrs. Lonstorf, as above recited. This letter, therefore, contained a misstatement as to the material facts. In addition to this, the previous correspondence does not show any full and fair disclosure of the facts of the transaction, and, on the contrary, indicates a studious withholding. of such information. We find no satisfactory evidence that Maas had previously informed Mrs. Lonstorf or her son, either by correspondence or on the train or elsewhere, that he had allowed the greater portion of the lease options to expire and had obtained therefor purchase options of which he claimed to be the sole owner, or had explained, fully and fairly, that he had in fact sold the company purchase options only, and that the $100,000 of notes had been merely allotted by him to Mrs. Lonstorf as her part of the supposed consideration for an imaginary lease on the properties.

It is clear, however, that the duty of a trustee or person occupying a fiduciary relationship to exercise the utmost good faith in all dealings with his cestui que trust or beneficiary extends to the matter of obtaining a release from such beneficiary; that it is his duty in making settlement to put the beneficiary in possession of a full and fair state-

ment of the affairs of the trust, uberrima fides on his part being required; and that a release obtained from the beneficiary through concealment or misrepresentation of essential or material facts is of no effect. Booth v. Bradford, 114 Iowa, 562, 87 N. W. 685; Jones v. Lloyd, 117 Ill. 597, 607, 7 N. E. 119; In re Hodges' Estate, 63 Vt. 661, 666, 22 Atl. 725; North Nebraska Fair Ass'n v. Box, 57 Neb. 302, 77 N. W. 770; Snailham v. Isherwood, 151 Mass. 317, 320, 23 N. E. 1135; Diller v. Brubaker, 52 Pa. 498, 91 Am. Dec. 177; Stewart's Estate, 140 Pa. 124, 21 Atl. 311; Alexander v. Solomon (Tex.) 15 S. W. 906; 2 Perry on Trusts (2d Ed.) § 923, p. 560; Hill on Trustees (Am. Ed.) 581. And see Field v. Banking Co., 77 Miss. 180, 26 South. 365, and Ludington v. Patton, 111 Wis. 208, 239, 86 N. W. 571. In Perry on Trusts, supra, it is said:

"A release by the cestui que trust will not be binding, unless the parties are made fully acquainted with their own rights, and the nature and full extent of the liabilities of the trustee. Any concealment, misrepresentation, or other fraudulent conduct will vitiate such a release. There should, therefore, be a full statement and detailed explanation of the accounts, * * * especially if there is anything in the nature of a breach of trust. Even if the accounts are clearly stated, the release will be set aside, if there is any misapprehension as to the basis upon which they are made up."

We do not think the general rule deducible from the foregoing authorities is in conflict with either Perkins v. Fourniquet, 14 How. 313, 327, 14 L. Ed. 435, in which it was held that there was no proof that the release in question was obtained by any fraud or circumvention, or Southern Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678, which involved merely the general rule as to the proof required to rescind a contract of purchase on the ground of fraudulent representation by the seller. And we find no well-considered case in which it is held that a beneficiary is bound by a release executed to a trustee under circumstances analogous to those appearing in the present record.

On the whole, therefore, we conclude that although Mrs. Lonstorf's conduct in executing the receipt, after the partial information which she had received, without further inquiry into the facts, was such that, if she had been dealing at arm's length with Maas, she might well be barred from repudiating the settlement made, yet in view of the fiduciary relationship between Maas and herself in the joint venture, added to the closeness of the kinship between them, the receipt given by her, based upon misleading statements and at least a partial suppression of the material facts, is not now binding upon her. Nor do we think that this conclusion is affected by the fact that the principal motive leading Mrs. Lonstorf to execute this receipt appears to have been her desire not to then break off her friendly relationship with Maas on account of the expectation of valuable services from him in connection with the renewal of the lease of the Negaunee mine; or that the fact that she delayed bringing her suit until after the negotiations for the renewal of this lease had been concluded at an increased royalty and for a large cash bonus, of which she received $500,000, either constitutes such laches as to now bar her claim against Maas, or creates, in the absence of any changed status on his part, any estoppel which

now prevents her from repudiating the settlement in question. We, accordingly, entirely concur in the conclusion reached by the trial judge that Mrs. Lonstorf is not now barred from recovering a full one-third of the proceeds of the joint exploration, upon paying one-half of the expenses thereof, in accordance with the terms of the original contract.

[4] 3. The court below was, however, in our opinion, in error in requiring Maas, in the final decree, to convey to Mrs. Lonstorf an undivided one-sixth in the mineral interest—apparently an undivided $1/24$—acquired by him in the Race Course property. The contract of November 25, 1898, refers only to "options on lands," and does not, we think, by its terms include the purchase of lands, requiring manifestly a much greater outlay of money than the acquisition of options merely, and involving a permanent investment in land as contrasted with a speculative venture requiring merely the outlay of sufficient funds to acquire options. Furthermore, Maas bought this interest with his own money. And on the same day he wrote Mrs. Lonstorf's son advising him that he had bought this interest, but not stating the amount paid or requesting her to contribute to the payment. In this letter he said: "I own to-night at least $1/24$. I bought it for a lever." And while thus referring to his purchase as a lever, we are of opinion that the entire tenor of this letter was that he regarded it as his own purchase and did not expect Mrs. Lonstorf to contribute to the purchase or share therein. She herself evidently so regarded it, and neither made any inquiry as to the price paid by him or offered to contribute thereto. In addition to this, both of Mrs. Lonstorf's sons specifically state that at the subsequent Milwaukee interview Maas told them that their mother was interested in all the lands inclosed within the heavy lines on the map, which he then showed them, except the Race Course property, which was one of the properties shown on the map within these lines. Maas further states, in substance, that when he pointed out to them on the map the properties on which he had options for purchase and options for lease, he spoke of the Race Course in which he had an interest in the fee, as they knew, but said that he had not succeeded in getting an option for lease and hoped, with his interest as a lever, that he would get it in the end. It does not appear that either Mrs. Lonstorf or her sons made any objection whatever to the specific statement by Maas that she was not interested in the Race Course property, or that she then claimed any interest in this property, or offered then or at any subsequent time to contribute to its purchase. We think that the undisputed evidence as to what occurred at the Milwaukee interview shows conclusively that all parties then understood that the interest which Maas had bought outright in the Race Course property belonged to him individually, but that if, by the use of his interest as a lever, he should succeed in getting an option for lease on the entire property, she would be interested in the lease option thus acquired. That Maas treated this interest as entirely separate from the joint exploration is further indicated by the fact that he did not provide for a transfer of this interest under the original option to the Cleveland-Cliffs Company, but retained it as his own property, and

subsequently transferred a half interest therein to the company as an entirely separate matter and for a distinct and separate consideration. Furthermore, Mrs. Lonstorf in her bill did not claim an interest in this property on the theory that there had been an actual purchase by Maas, but, on the contrary, alleged that he had acquired an option for its purchase which he had transferred to the company with the other options for purchase and as part of the same transacation.

We therefore must conclude that, both under the plain terms of the contract and as it was construed by the parties themselves, the interest in the Race Course property was not purchased by Maas on the joint account, but, as Mrs. Lonstorf then and afterward understood, was acquired and retained by him as his sole and individual property, without objection on her part; and that, under the doctrine of Twin-Lick Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328, having for so long a time, with full knowledge, acquiesced in this independent purchase on his own account, she cannot now, after it has resulted profitably, through the increased royalty realized by him from the assignment of a one-half interest therein to the Cleveland-Cliffs Company, be permitted in equity to claim an interest in the purchase.

[5] 4. We are of opinion that the court below was likewise in error in holding that Maas was chargeable on the accounting with one-third of all the royalties which he had received from the Cleveland-Cliffs Company between the date of the execution of the lease and January 20, 1910, amounting to $53,111; that is, with $17,703.70, and interest. Only $35,407.40 of this amount was received by him as royalties under the original terms of the lease executed as part of the sale to the company of the purchase options in which Mrs. Lonstorf was interested; the remaining $17,703.70 being received under the supplemental agreement as to an increase in the royalties in consideration of his transfer of one-half of his separate undivided interest in the Race Course property and of his "good will." As the consideration for this supplemental agreement was furnished solely by Maas, by a transfer of his own individual property, we are constrained to hold that Mrs. Lonstorf is not entitled to share in the increased royalties received thereunder, and that Maas is properly chargeable with only one-third of the royalties which he received under the original terms of the lease as part of the proceeds of the transfer of the purchase options in which Mrs. Lonstorf was interested with him.

In the defendant's assignment of error the royalty received by Maas under the supplemental agreement is, by an obvious clerical error, stated as one-fourth of the total amount, namely, $13,277.75. We think, however, that under rule 11 of this court (150 Fed. xxvii) we may take notice of the full extent of the error in this matter, although not properly assigned; and hence conclude that the decree in reference to this item should be corrected so as to charge Maas on this account with only one-third of $35,407.40, that is, with $11,802.15, and interest.

[6] 5. It further appears that during the progress of the exploration Maas employed his brother, William J. Maas, as an expert and confidential driller, and agreed to pay him $80 per month in cash and one-fourth of his own profits in the venture. The $80 per month was

charged to the joint account and acquiesced in by Mrs. Lonstorf. Later Maas paid his brother the sum of $24,583 as one-fourth of his profits. The learned trial judge was of opinion that while the services which his brother rendered were largely, if not entirely, those which it was his own duty to perform under the original contract, yet, as Mrs. Lonstorf had acquiesced in this employment, she should be charged, as part of the joint expenses, with one-half of the amount paid his brother, the extent of the reasonable value of the services rendered, such reasonable value being fixed by the court, under all the evidence, at $4,510.00, of which one-half was charged to Mrs. Lonstorf. Both appellants have assigned error; Mrs. Lonstorf insisting that she should not be charged with anything on this account, and Maas, that she should be charged with one-half of the entire $24,583. After careful consideration of the evidence, we are of opinion that the court below reached the substantial equities of the situation in accordance with the spirit of the contract and in view of the undoubted benefit accruing to Mrs. Lonstorf by reason of the rendition of these services, and find no error in its decree in this behalf.

6. In the reference under the accounting Maas also claimed a credit of $25,000 for services rendered by him subsequent to the execution of the lease to the Cleveland-Cliffs Company, stating in his evidence that he claimed this as compensation for services he subsequently rendered in clearing up titles in certain lawsuits and aiding the company in the development of the leased property. His testimony is, however, very vague as to the services rendered. The court below was of opinion that while the amount claimed by Maas was wholly unjustified by any services he could specify in this immediate matter, nevertheless, as the proof showed that during the two years after the execution of the lease, while Mrs. Lonstorf was apparently resting content with her division of the profits, he has assisted in negotiating a renewal of the lease of the Negaunee mine, from which she received a bonus of $500,-000 and an increased royalty, and as the whole record, in the opinion of the court below, put this matter fairly though not directly, in issue, Maas should be allowed for his services in these two closely related matters, namely, the Negaunee lease and his own lease, the sum of $25,000, of which one-third, or $8,333, was charged to Mrs. Lonstorf. Both appellants have assigned error; Mrs. Lonstorf insisting that she should not be charged with anything on this account, and Maas, that she should be charged the full sum of $25,000 for his services in perfecting title and enhancing the value of his lease, in addition to the full value of his services to her in negotiating the renewal lease of the Negaunee mine.

After careful consideration we are constrained to hold that Mrs. Lonstorf is not properly chargeable in any sum whatever on account of either of these matters. In so far as his services in connection with his own lease are concerned, the evidence, is not merely so indefinite as to form no satisfactory basis upon which any allowance could be made, but it may well be doubted whether, by analogy to the rule laid down by this court in Ruggles v. Buckley, 175 Fed. 57, 99 C. C. A. 73, 27 L. R. A. (N. S.) 541, 20 Ann. Cas. 1057, compensation could be in

any event allowed him for services rendered after the execution of the lease, in the absence of a special agreement with Mrs. Lonstorf, especially since he was assuming to own the entire lease in derogation of Mrs. Lonstorf's rights.

[7] But aside from these matters, we are clearly of the opinion that the allowances claimed by him are entirely foreign to the pleadings. No claim for services in reference to either of these leases was set up in his answer or put in issue in any way under the pleadings, or included in the order of reference to the master. Nor was his claim for services in reference to the Negaunee lease even included in the items for which he claimed credit in the list filed by him before the special master; the testimony in reference to his services in this matter being apparently introduced, not as a matter of accounting in this case, but solely in support of his theory as to Mrs. Lonstorf's motive in executing the receipt for the $100,000 of notes and delaying the filing of her bill. Mrs. Lonstorf was clearly not required under any issue made in the case to introduce any proof before the master on the accounting in reference to his services in either of these matters; and under the limited scope of the reference to the master she properly did not attempt so to do. And while it would appear that Maas' services in connection with the renewal of the Negaunee lease were very beneficial to her, although the extent to which he was acting in the matter as the representative of his mother and for her benefit instead of for Mrs. Lonstorf is not shown, and that in a proper case, upon issue properly joined, he might well be entitled to recover just compensation from her for such services, we are constrained to conclude that, under this bill and the issues made thereunder, so much of the decree below as charged Mrs. Lonstorf in any sum for his services in reference either to his own lease or the renewal of the Negaunee lease, was coram non judice; and cannot, for this reason, be sustained.

7. Without setting forth in detail the various assignments of error of the parties, the determination of which is sufficiently indicated by the conclusions hereinabove stated, it is sufficient to say that, upon the whole case, we are of the opinion that the final decree below is erroneous in the following respects: (1) In so far as it directed Maas to convey to Mrs. Lonstorf an interest in the Race Course property; (2) in so far as it adjudged Maas to be chargeable to Mrs. Lonstorf on account of royalties received by him in excess of $11,802.15, and interest thereon; and (3) in so far as it charged Mrs. Lonstorf on the accounting with the sum of $8,333, or any sum whatever, for services rendered by Maas in connection with his own lease or the Negaunee lease. In other respects we are of opinion that the decree below is correct and should be affirmed.

The decree below will, accordingly, be reversed to the extent hereinabove indicated, but otherwise in all things affirmed, and the cause will be remanded to the court below for further proceedings not inconsistent with this opinion. Each of the appellants will pay one-half of the costs of these appeals.