## HAWKER v. WORLEY (two cases). *

Circuit Court of Appeals, Eighth Circuit. June 10, 1929.

Nos. 8149, 8150.

*Rehearing denied September 23, 1929.

Frederick A. Peek and Preston C. West, both of Tulsa, Okl. (Peek & Gilbert and West, Gibson, Sherman, Davidson & Hull, all of Tulsa, Okl., on the brief), for appellant and plaintiff in error.

Neal E. McNeill, of Tulsa, Okl., for appellee and defendant in error.

Before STONE, Circuit Judge, and FARIS and SYMES, District Judges.

SYMES, District Judge. These two cases grow out of one suit, originally instituted in the United States District Court for the Northern District of Oklahoma by W. D. Hawker, appellant, plaintiff in error, against H. F. Worley, appellee, defendant in error, to recover $5,000, the alleged difference between the price for which the latter as broker actually sold an oil and gas lease for plaintiff, and what he represented the price to have been. Worley, by way of answer, exhibited a general release admittedly executed by both parties. The plaintiff replied, setting forth facts by virtue of which he alleges the release was without effect, and asks that it be set aside. The issue thus made by the answer and the amended reply was the matter actually tried in the court below, which found in favor of the defendant, Worley. Hawker brings the case here, both by appeal and writ of error, on the one record.

Dr. Hawker in the year 1922 was the owner of 11 oil and gas leases in Okfuskee county, Oklahoma. Two of them, mentioned in this record, may be referred to as the section 12 lease and the section 2 lease, respectively. In March of that year the defendant, Worley, a gas lease broker, of Tulsa, Okl., called upon Dr. Hawker in St. Louis, and upon his solicitation a contract was entered into, constituting Worley exclusive agent for 90 days to sell the section 2 lease, Worley to get 5 per cent. of the selling price up to $30,000. Dr. Hawker at the same time informed Worley about his other leases, including the section 12 lease, and placed them in his hands for sale under a verbal agreement; plaintiff stating it was his understanding that he was to pay a commission of 5 per cent. in the event Worley consummated a sale.

About the 20th of May following, the defendant notified the plaintiff, who resided in St. Louis, that he had found a buyer for the section 12 lease at $20,000, and requested plaintiff to forward an assignment thereof to one Elliott, with draft attached for $20,000, to a bank in Tulsa. The plaintiff did so, and upon receipt of the proceeds mailed his personal check to Worley for $1,000, marked "Commission in full for selling my lease in 12—10—9." Defendant received and cashed the check.

Plaintiff alleges that he relied upon the defendant's statements as to the terms of the sale, and had no reason to suspect that the transaction was other than as represented. He then alleges that the defendant, with the help of two other brokers, Elliott and Herod, actually sold the lease for $25,000 to the Gypsy Oil Company, and split this extra $5,000 with them, unknown to him, and sues to recover the same; that he did not discover these facts until February, 1926, when it was called to his attention by the federal income tax authorities.

Defendant answered, denying any fraud or concealment, alleging that he was to receive 5 per cent. of the first $15,000 for the sale of the section 12 lease, plus 50 per cent. of any amount over $15,000; admits that the lease was sold to the Gypsy Oil Company for $25,000, and that they divided the extra $5,000; admits that he instructed Hawker to draw a draft on Elliott for $20,000 and assign the lease to him, and that Dr. Hawker paid him the $1,000, all as alleged, but that he (Hawker) was fully advised at the time of all the facts. Defendant also pleads the statute of limitations, and as a separate defense sets out the sale of the section 2 lease for plaintiff, and alleged that, a disagreement having arisen over the commission due, he (Worley) started an action in the local state court; that thereafter, on June 6, 1922, they entered into a written agreement in the nature of a receipt and general release, which admittedly purports to settle all disputes between the parties.

Plaintiff, in his amended reply, admits the execution of the instrument in question, but alleges that the only dispute that actually existed was over the sale of section 2, and the only suit he knew about when he signed the release was concerning that sale; that for many years thereafter he was entirely ignorant of the fact that the section 12 lease had been sold for $25,000, and had no reason to suspect bad faith on the part of his agent, and asks to have the release set aside.

Defendant testifies to certain alleged telephone conversations with the plaintiff, who at all times was in St. Louis, in the course of which he says he made full disclosures of the real facts of the transaction. This is wholly uncorroborated, and inconsistent with the defendant's conduct and admissions, such

as his request that Dr. Hawker send an assignment of the lease on section 12 to Elliott, and draw on the latter for $20,000, and his acceptance of the $1,000 check as his commission—all of which are consistent with, and corroborate, the plaintiff's version of the transaction.

The testimony of defendant's one-time lawyer, Woodard, is so evasive that it casts suspicion upon the defense. It was he who, in answering a letter from Dr. Hawker, inclosed the general release, referring to it as a receipt, and stating that upon its return he would dismiss the suit. Worley, through different attorneys, had filed two separate suits in the state courts against Dr. Hawker, first to recover the $1,000 commission alleged to be due on the first sale. The complaint was filed, garnishment issued, but no service appeared. The case was not pressed for the reason, no doubt, that shortly thereafter Dr. Hawker sent on a check for $1,000 as aforesaid. The complaint in this suit, verified by Worley, sets out the transaction exactly as Dr. Hawker testifies. About the same time the second suit was filed for commissions due on the second sale. It is most reasonable to suppose that this is the one referred to in the release and the letter of Woodard. His failure to mention both actions is significant. The testimony fully substantiates the plaintiff's contention that, at the time this release was executed, he did not know that the lease in section 12 had been sold for $25,000, and requires findings in favor of plaintiff on the facts.

As a matter of law, can the general release be set aside? The defendant was plaintiff's agent, and plaintiff relied upon him as such. He was not present, and had no reason to make any investigation or check up the transaction as reported by defendant over the long-distance phone. The relation of defendant to plaintiff was that of a fiduciary, and it continued until a full disclosure was made. In 2 C. J. 692, it is said that an agent must "act with the utmost good faith and loyalty for the furtherance and advancement of the interests of his principal. * * * So sedulously is this principal guarded that all acts of an agent which tend to violate his fiduciary duty are regarded as frauds, * * * invalid as to the principal, * * * also against public policy. * * * If the agent fails to exercise good faith and loyalty, * * * he is responsible to his principal for any loss resulting therefrom; that an agent must not * * * represent interests adverse to those of his principal. He must not put himself into such a position that his interests become antagonistic to those of his principal. If he violates the rule, the principal, when he acquires full knowledge of the facts, may repudiate the transaction, or adopt it and compel the agent to account for any profits made thereby. * * * He may be held as a trustee [page 697], and compelled to account for profits made by selling his principal's property at a greater price than that which he represents to his principal that he sold it for," etc. (page 699).

"A misrepresentation is that, which, if accepted, leads the mind to an apprehension of a condition other and different from that which exists. * * * Any statement made of a substantive fact material to a proper understanding and a fair adjustment of the matter in hand, * * * and thereby secure an undue advantage, involves the element of fraud, and fraud vitiates all contracts." Haigh v. White Way Laundry, 164 Iowa, 143, 145 N. W. 473, 50 L. R. A. (N. S.) 1091.

In Maas v. Lonstorf (C. C. A.) 194 F. 577, at page 587, it is said: "It is clear, however, that the duty of a trustee or person occupying a fiduciary relationship to exercise the utmost good faith in all dealings with his cestui que trust or beneficiary extends to the matter of obtaining a release from such beneficiary; that it is his duty in making settlement to put the beneficiary in possession of a full and fair statement of the affairs of the trust, uberrima fides on his part being required; and that a release obtained from the beneficiary through concealment or misrepresentation of essential or material facts is of no effect"—citing cases. See, also, "Release," 23 R. C. L. § 25.

Defendant relies upon Houston v. Trower, 297 F. 558 (8th C. C. A.), in which a release purporting to constitute a settlement of all claims between the parties was held to include claims not discussed or known at the time of the execution of the release. The court there, however, carefully distinguishes its case from those where there was concealment or a trust relation existed, stating that in the case under discussion the parties were dealing at arm's length with one another in settling their mutual claims.

In Trice v. Comstock, 121 F. 620, 61 L. R. A. 176 (8th C. C. A.), Judge Sanborn discusses fiduciary relations and betrayal of confidence, and says that the mere existence of the relation, and the abuse of confidence bestowed by the agent for the purpose of acquiring gain, is alone sufficient to call into play the trust relationship doctrine. We find no well-considered authority for holding the principal bound by a release executed to his

agent under circumstances comparable to those presented by this record.

On the plea of the statute of limitations: The plaintiff did not learn of the fraud until 1926, and up to that time had no reason, in the exercise of diligence, to suspect the defendant. Therefore Clapp v. Leavens (C. C. A.) 164 F. 318, holding that mere ignorance, without concealment of facts, which ordinary diligence can discover, will not prevent the running of the statute, does not apply. To the same effect is Redd v. Brun (C. C. A.) 157 F. 190, in which the plaintiff was held bound by facts that an examination of the public records would have disclosed. The case at bar is distinguishable from the authorities cited by appellee, because of the affirmative acts of concealment and misrepresentation of defendant.

Finally, counsel argues that in equity, where the chancellor had considered conflicting evidence and testimony, the presumption is that his findings are correct, unless it clearly appears that an obvious error of law has been entered into, or serious mistake of fact made, citing Coats v. Barton (C. C. A.) 25 F.(2d) 813. The lower court was convinced that the defendant was not entitled to keep the $5,000 that plaintiff seeks to recover, and inclined to the view that the plaintiff did not know that the actual purchase price in question was $5,000 more than reported by Worley. It would seem, therefore, that the chancellor believed the plaintiff's story as a whole.

For the reasons stated, we are of the opinion that the defendant's testimony falls far short of making an issue of the matter raised by the amended reply. For that reason the judgment of the lower court on the appeal, No. 8149, should be reversed, and the case remanded for further proceedings in conformity with this opinion. The writ of error, No. 8150, is dismissed at the costs of plaintiff in error. It is so ordered.