### HOUSTON et al. v. DEXTER & CARPENTER, Inc.

(District Court, E. D. Virginia. June 10, 1924.)

No. 84.

**1. Mines and minerals ⬅101—Contract held one of joint adventure.**

An agreement between complainant partnership and defendant, both dealers in coal, to lend equal sums to a third party to enable him to purchase a coal mine, in consideration of which they were to have the exclusive agency for sale of the product for two years, on equal terms, at a stated commission, held one of joint adventure, under which the commissions were to be equally divided, whether sales were made by one or the other, and losses, if any, equally shared, and which created a fiduciary relation requiring the utmost good faith and fair dealing between them, and protection by each of the interests of the other.

**2. Equity ⬅80—Delay in bringing suit held excused by conduct of defendant.**

Delay of three years by complainants, after their wrongful exclusion from a joint adventure, before bringing suit for an accounting, held not

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

such laches as to bar them from relief, where full and fair disclosure of the situation was not made by defendant, and they relied in good faith on its explanation that the contemplated arrangement had fallen through and could not be carried out.

3. **Mines and minerals ⊛⇒101—Agreement for joint adventure held not terminated by acquisition by one of the parties of the property which was the subject-matter of the contract.**

Complainants, as partners, and defendant entered into an agreement of joint adventure with a third party by which they were to advance him equal sums with which to purchase a coal mine, in consideration of which they were to have, on equal terms, the exclusive agency for two years for sale of the coal at a stated commission. The third party was unable to make the purchase without more money, and by agreement between him and defendant, without the knowledge of complainants, defendant was substituted as purchaser, on terms agreed upon between them, which included recognition of complainants' rights under the previous agreement. Defendant, however, returned the money advanced by complainants and notified them that the arrangement had fallen through and that it had purchased the mine independently. *Held*, that the substitution of defendant as purchaser, under the circumstances, did not terminate the joint adventure, but that defendant took the property charged with the equities of complainants under the agreement.

4. **Joint adventures ⊛⇒1—May be established by parol.**

Where the evidence, though by parol, shows a joint adventure, the fiduciary relationship thereby created makes each of the parties trustee for the other, and a court of equity has jurisdiction to enforce rights growing out of such relationship.

5. **Corporations ⊛⇒379—Agreement of joint adventure held not ultra vires.**

An agreement by a corporation engaged in the business of selling coal on commission, by which it engaged in a joint adventure with another dealer to procure coal for sale on joint account, the commissions to be divided, *held* not ultra vires, as creating a partnership.

In Equity. Suit by W. W. Houston and Paul L. James, partners trading under the firm name of the Pan-Handle Coal Company, against Dexter & Carpenter, Inc. Decree for complainants.

Robert P. Patterson (of Webb & Patterson), of New York City, and Thomas H. Willcox (of Willcox, Cooke & Willcox), of Norfolk, Va., for plaintiffs.

W. B. Symmes, Jr. (of Davis, Symmes & Schreiber), of New York City, Edward R. Baird, Jr., and R. Clarence Dozier (of Baird, White & Lanning), both of Norfolk, Va., for defendant.

GRONER, District Judge. W. W. Houston and Paul L. James, plaintiffs, are partners in the wholesale coal business, having offices in Norfolk and New York, under the trade name of Pan-Handle Coal Company. Dexter & Carpenter, Inc., defendant, is a corporation, also engaged in the wholesale coal business, with offices in New York and Boston. The J. B. B. Coal Company is a corporation, with its principal office (formerly) in Detroit, Mich. It owned a coal mine in West Virginia.

In the latter part of July, 1920, one Stone, an officer in a corporation owning a minority of its stock, came to New York seeking financial assistance in an effort to acquire the property for his personal account. He interviewed various coal operators without success. About July

28th or 29th he called at the office of the plaintiffs in New York, and met Mr. James, to whom he stated that, if he could procure an advance or loan of $200,000, he would take over the property and execute a contract to ship the coal produced at its mine to the person making the advance or loan, for sale, as agent, on an 8 per cent. commission basis for a period of two years. There was an active—indeed, an abnormal— market for coal at that time. James advised Stone that he was interested, but that he would have to take the matter up with Houston, his partner, and perhaps with other people in the same business. Stone replied that time was of the essence, since it was necessary for him to have on hand "some real money" within the next few days to show his good faith. Obtaining Houston's approval, James went to the defendant, at its office in New York, and, after some preliminary discussion, disclosed the plan and invited defendant to join them on an equal basis in putting it through. An interview was arranged for the next day, July 31st, at which Carpenter, vice president of defendant, James, and Stone were present. At this interview a verbal agreement was entered into whereby the plaintiffs and defendant were jointly to advance Stone $200,000 to enable him to acquire the property. When this was accomplished, a contract was to be entered into whereby, for a period of two years, beginning August 1, 1920, plaintiffs and defendant were to be the exclusive Eastern sales agents for the property on an eight per cent. commission basis. $100,000 was thereupon advanced to Stone by defendant, and $50,000 by plaintiffs the following Monday morning, and the remaining $50,000 was to be paid over by them on demand within 15 days.

As a result of this arrangement Stone went to Boston, where the control of the stock of the coal company was held. There it was ascertained that $200,000 was not sufficient to consummate the deal, but that an additional $100,000 was necessary. Stone was unable or unwilling to supply this sum, but tried to reach James on the telephone, and, being unable to do so, succeeded in talking to Carpenter, as a result of which he returned to New York and a further conference was had, August 3d, between Dexter, defendant's president, Carpenter, and Stone; James not being present (although Stone—mistakenly, I think—says he was). At this conference Dexter and Carpenter agreed tentatively to provide the additional sum of money in consideration of an interest in the stock of the coal company, and, in order to carry out the project, Stone and Dexter returned the same night to Boston. In the conference with the owners of the coal company which followed it developed that, even with the additional $100,000, Stone's proposition could not be carried into effect. The coal company, apparently, owed debts to the extent of $650,000. The owner of the stock was unwilling to sell the stock, except with the guaranty from a responsible buyer that these debts would be discharged, and was unwilling to accept Stone as a guarantor.

Stone, realizing the embarrassments of the situation, suggested to defendant that it should on its own account carry out the purchase, and this plan was finally adopted, with the consent of the seller of the stock, and late in the evening of that day, August 4th, a contract was

signed between Dexter & Carpenter, Inc., on the one hand, and Stone, on the other. This recited the proposed agreement between the owner of the stock of the coal company and defendant, as a result of which the latter was to purchase the total capital stock of the coal company for $300,000 cash and the guaranty of $650,000 of debts, that plaintiffs had deposited with Stone $50,000, to be used on account of the cash payment of $300,000, and had agreed to pay an additional sum of $50,000 to be used for the same purpose, upon the understanding that they should have the exclusive right to sell one-half of the output of the coal company for two years, beginning August 9th, at a commission of 8 per cent. f. o. b. mine. It further provided that, if plaintiffs should fail to advance the additional sum of $50,000, they should have the right to sell only one-fourth of the mine production, and the defendant would have the right to sell three-fourths. Other conditions followed in which the plaintiffs were not concerned. By the terms of this contract, after the repayment of the $200,000 to defendant and $100,000 to plaintiffs, Stone was to have turned over to him in his own right 25 per cent. of the stock of the company. This arrangement, presumably, was Stone's profit out of the transaction.

After the execution of the agreement the parties returned to New York, and, on August 5th, James called at defendant's office, having called the previous day and been notified that Dexter was in Boston and would return the following day. At the interview that ensued Dexter told James that Stone was having some trouble getting the deal through, and that he had been up to Boston the day before to help him, and at the same time handed James a contract, which he read, but took no copy of, and which he understood was a contract between the owners of the mine, Stone, and defendant. James observed that it carried out the proposition he had in mind, in that it provided for his share of the tonnage and "took care of our [his] interests just as I had expected." He suggested that before signing any contract he preferred to have Houston pass upon it. Apparently, from this date until August 17th there was, as between plaintiffs and defendant, a hiatus in the negotiations. On the last-named date James was in Cincinnati (Stone's headquarters) and called on Stone, and learned that the latter was going to Boston in a day or two to complete the transaction. Stone suggested that James and Houston meet him and Dexter the early part of the following week.

On his return to New York James called up defendant's office, and was advised that Dexter and Stone were in Boston closing the deal; Carpenter informing him at that time that it looked as though it (the defendant) had bought the mine, and suggested to James that he phone again the next day. On the next day James phoned, and was told that Stone had fallen down entirely in his proposition, that Dexter & Carpenter had purchased the mine "along the lines that somebody else had presented to them," and that plaintiffs' check for $50,000 would be immediately returned. The next day, which was the 25th of August, Houston came to New York, and found awaiting him a letter from defendant, returning the $50,000 and stating that Stone had been unable to carry out the deal, and that this was partially due to plaintiffs' in-

ability to make the $50,000 payment due by them and partially to other reasons, which Stone had explained to them, informing plaintiffs that defendant had itself purchased the mine, and that it would be glad to discuss some new arrangement for the sale of some of the tonnage, if it could be worked out.

Houston and James immediately called at defendant's office, where Dexter repeated practically the same language of the letter. The interview was short. Houston expressed regret that the deal had fallen through, and, in reply to the suggestion that the failure of himself and James to put up their additional $50,000 had been partially responsible for it, stated that they were at all times ready to put it up, but had had no notification that the money was wanted. No definite arrangement was made with regard to plaintiffs' handling any part of the output of the mine, and nothing was said about the August 4th contract, nor about any payment to Stone, although the evidence shows that in the consummation of the purchase the day before in Boston Stone had agreed, at Dexter's insistence, upon accepting $50,000 in lieu of any stock interest in the company. Thereafter defendant, as owner of the coal property, shipped its output exclusively to itself, and refused to allow plaintiffs any interest therein, although from time to time promising, in vague terms, to do something in recognition of their rights.

[1] This suit was brought on the 11th day of July, 1923, in the circuit court of Norfolk City, and by appropriate proceeding was removed to this court. The basis of the complaint is that in the agreement between Stone, on the one hand, and plaintiffs and defendant, on the other, a joint adventure was undertaken, and that by the wrongdoing and fraud of defendant the plan was frustrated, to the financial loss of plaintiffs and benefit of defendant. Plaintiffs, therefore, ask an accounting and a division of profits. In order to arrive at a conclusion, it is necessary to consider, first, whether there was a joint adventure, and, if there was, whether the same was terminated by the inability of Stone to carry out its terms. Defendant insists, however, that, even if the first question should be decided in the affirmative and the second in the negative, there can be no decree in favor of the plaintiffs in this case, because such a joint adventure, if there was one, would be invalid under the statute of frauds, and also because such an adventure was beyond the corporate power of defendant, and, finally, that the plaintiffs are estopped to claim anything by reason of their acceptance of the return of their money, with knowledge of all material facts, and their inaction thereafter for a period of nearly three years.

The determination of the question of whether there was a joint adventure depends upon the single fact whether, in the agreement made between plaintiffs and defendant, the contract which Stone proposed to make contemplated that each of the two parties should receive, as selling agents, one-half of the output of the mine, to be sold by each individually, the repayment of the loan made by each individually to be deducted from the proceeds of sales so made, and the commissions determined by the services rendered by each, respectively, or whether the entire output of the mine was to be shipped for joint account, and, whether shipped to one or the other, or in equal or unequal propor-

tions, the profits and, inferentially, the losses, if there were any, should be equally divided. If this were the only question in the case, since it presents a question of fact, it would, perhaps, have made a case for determination by a jury; but as other questions, involving the alleged fraud and suppression by defendant of information which plaintiffs were entitled to, and other similar questions, are involved, this court, on the motion to dismiss, assumed jurisdiction, and it therefore becomes my duty to pass upon this question of fact.

The conflict of evidence on this point is not difficult of explanation. Both parties testify largely from memory, and it is, doubtless, not too much to say that neither party had in mind, during the period of the negotiations, the distinction which is now urged. The plaintiff James testifies that Stone, in contemplation of the acquisition of the mine, offered to turn over to him, as selling agent, its entire output for a period of two years, or an 8 per cent. commission basis. James, after some unsuccessful efforts to interest some other coal dealers, called defendant on the telephone and arranged a meeting at its office. James first proposed that defendant would advance the entire $200,000 in consideration of getting the coal (which at that time was in great demand). The defendant's president answered that, inasmuch as it was asked to put up so much money, "I think you ought to take us in as partners with you on the proposition." James replied that he had not yet discussed this question with his partner, Houston, but, as he expresses it, the time was short, and he was willing to secure half a loaf, rather than no loaf, and apparently agreed to this proposition. The matter was thereupon postponed to the next day, in order that both interests might discuss it—the plaintiff with his partner, Houston, and the defendant's president with other officers of his corporation.

The next day, upon invitation of defendant, James and Stone met Carpenter at the latter's office. At this meeting plaintiffs were asked if they were not getting some of the stock of the coal mine as a bonus for the advance of money. There was some discussion over this, but apparently Stone announced that there would be no bonus stock. Carpenter insisted that, if later there was any bonus stock, it would be divided on a "fifty-fifty" basis, remarking, as James now testifies, that they were going into the proposition on that basis, and that they would later determine how the coal was to be handled—that is to say, whether half to the plaintiffs and half to the defendant—but that in either event it was understood that the commissions would be divided, in consideraion of which each was to advance Stone $100,000. The amount which defendant was to advance was forthcoming immediately, and the receipt which Stone signed in acknowledgment of this amount stated that:

"Pan-Handle Coal Company and Dexter & Carpenter, Inc., are to be the exclusive Eastern sales agents for the period of two years beginning August 1, 1920, on the basis of 8 per cent. of the mine's price of the coal. The Pan-Handle Coal Company and Dexter & Carpenter, Inc., are to share the tonnage and commissions equally."

It is true that Carpenter's recollection of the conversation is somewhat different from this. What he says is that James told him of the proposition that had been made to him and of the necessity of having

$200,000 in cash to put it through; that James and his partner were unable to finance it themselves, but were willing to put up $100,000 cash if his company would put up the other $100,000, "each taking a half of the output of the mine, getting a commission of 8 per cent., have the money refunded to us at the rate of $1 per ton on shipments made from our invoices as rendered, plus 6 per cent. interest." But, as already stated, I have no doubt that neither of the parties was particular as to the language used. Both were intent upon securing the benefits of what appeared to be, and turned out to be, an advantageous contract; but it seems to me that Carpenter's testimony in this respect ought not to be accepted, in view of the language contained in the receipt, written while the matter was under discussion, and doubtless then reflecting the views of all concerned.

In addition to all of this, the circumstances surrounding the entire transaction, including Carpenter's own statement that, if the market at tidewater declined and the market west advanced, as a consequence of which the coal was shipped west rather than to tidewater, the commissions would be earned and divided precisely as though the coal had actually been handled by either or both of the parties, lead me to conclude that the agreement as proposed by James, and as accepted by defendant, was, call it by whatever name you may, an agreement to contribute in equal amounts the capital necessary to obtain the same and to share ratably the benefits accruing therefrom. It is probably true that there was no discussion of the question of losses, if any should occur; but this is by no means remarkable, for it is difficult to understand how any would occur. Neither of the parties was to be anything more than an agent of the owner of the coal mine, and, in the exercise of ordinary care, such losses as occurred, if any, by failure on the part of the purchaser of the coal to pay for the same, would have been the losses of the owner, rather than the agent. If in any other way losses had occurred, as to which no instance was suggested, it would not be going too far to say that the law would imply an agreement to assume them equally. Van Tine v. Hilands (C. C.) 131 Fed. 124. So that, under the circumstances, there arose out of the agreement an obligation on the part of each of the parties to exercise toward the other the utmost good faith and fair dealing, and the further obligation on the part of each to protect the rights of the other equally with his own. This is fundamental.

The defendant, as amply appears from the evidence, was a large and prosperous company, engaged in an extensive business. It had agencies in several parts of the country. Its guaranty of debts of over half a million dollars was apparently accepted without question on the part of the owners of the coal mine in question. Its two principal officers were men of business acumen and judgment, and, compared to the plaintiffs, its influence and ramifications were such as entitled it to leadership in a venture of this character. It is not, therefore, surprising that James was content to turn over the details of the transaction and await results. Three or four days after the verbal agreement was entered into he was shown by defendant a contract which, in his view, provided adequate protection to the rights of himself and his partner.

He says the contract that was shown to him was not the August 4th agreement, afterwards admitted in evidence. I am disposed to think that in this he is mistaken. It is unlikely that at this time defendant, or any of its officers, had any other purpose, so far as the shipment of coal was concerned for the two-year period, than obtained at the conference of a few days previous. It was not until later, and when the purchase had been finally consummated and the property was in its hands, that this purpose changed, and a new viewpoint became manifest.

All of the parties identified with defendant's interest have testified that there was no other contract at or about this time than that of August 4th. It is altogether improbable, and indeed I think it is out of the question, that a different contract was manufactured for the purpose of lulling James into a sense of false security. The contract that was shown him on that day was, in my opinion, doubtless the contract in evidence. It is true that this contract is not in the simple language of the original agreement. It brings in additional parties and provides for additional matters. It contemplates, and provides for the substitution of the defendant in the place of Stone as the owner of the coal mine proposed to be purchased. It includes the compensation to be paid to Stone growing out of this change, and in its recital clauses it shows the interest of the plaintiffs, upon the deposit by them of the additional $50,000, to be the exclusive right to sell one-half of the output of the coal company for two years. But it does not purport to be, and is not, an agreement between plaintiffs and defendant. On the other hand it is, what it purports to be, an agreement between Stone and defendant. Its purpose was to fix and determine the rights of these two parties as between themselves, and, so far as plaintiffs are concerned, the recitals therein were pure surplusage.

It is insisted, however, by defendant, that the fifth paragraph of this contract, which is the one reciting plaintiffs' rights under the agreement, is an ascertainment of what those rights are, or rather is an exposition of the intent of the parties on that subject, and that, since this right is described as the naked right to the agency for one-half of the output of the coal mine for a period of two years, it negatives the idea of partnership or community of interests. The answer to this is, first of all, that the paper was drawn by attorneys representing Stone and defendant, and not by attorneys representing plaintiffs. Its terms were doubtless suggested by Dexter, then present at the time it was drawn, rather than by Carpenter, with whom the original agreement was made.

It is true it was, if I am correct, incidentally shown to James, but it is equally true that he did not approve it, although he may have found no fault with it, but asked for its submission to his partner, Houston. In no aspect can it be claimed that he consented to its changes, or indeed ever understood them; its effect, therefore, upon plaintiffs' rights is nil. James' examination of it was so superficial that he never mentioned it to his partner, nor recalled any other fact or circumstance in connection with it than that the contract which he had seen appeared to be one between the coal company, Stone, and the defendant, in which the interests of the plaintiffs were protected. It goes without saying

that it was the duty of defendant to disclose to plaintiffs all that occurred in connection with the carrying out of the original agreement. In the visit that defendant, through its principal officer, made to Boston with Stone, it acted, or should have acted, as trustee for plaintiffs, and in law and fair dealing it was charged with the obligation, first, of doing nothing against their interests, and, secondly, of a frank and complete disclosure of all that occurred, so that plaintiffs, in what they might do, should have full information. Maas v. Lonstorf, 194 Fed. 577, 114 C. C. A. 419; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764.

[2] During all of this time James had from time to time been seeking information as to the status of the deal. On the 19th of August he was in Cincinnati, where he was informed by Stone that the transaction was soon to be closed satisfactorily. There was nothing in this interview to put him on notice that the plan originally proposed was in process of change. There was nothing to excite his alarm, and it was not until his return to New York a few days later, and after ownership of the property had passed, that he was advised that Stone had been unable to complete the transaction, and that his erstwhile partner had purchased it on other and different lines. If then and there plaintiffs had protested, and insisted upon knowing the details of the transaction by which they had been ejected from participation in its advantages, and, upon refusal of this information, had brought this suit, the situation would have been rendered much more easily understandable. But, apparently, they accepted, without protest or investigation, the statements which had been made to them, and waited nearly three years to commence this litigation. They are both men of business ability and of experience, and their failure to exercise what now, in the light of after events, seems ordinary prudence and sagacity in the protection of their own interests, is difficult to understand.

If the evidence showed, or tended to show, a frank and full disclosure of the situation at the time of the final interview, or at any time prior thereto, this delay would undoubtedly be fatal; but, in view of the fact that it is not contended by defendant that any explanation was made to them, except such explanation as is contained in the letter which has been referred to hereinabove, and also in view of their statement that they accepted such explanation as was made in good faith, and were lulled into quietude by repeated, though vague and indefinite, promises on the part of defendant's officers to recognize and protect their interests, it would perhaps be inequitable to deny them relief, if otherwise entitled to it. And this is especially true where their delay has not operated to mislead or prejudice anyone else. See Edward v. Johnson, 90 S. C. 90, 72 S. E. 638.

[3] It therefore becomes necessary to consider whether a recovery may be had in this suit, notwithstanding the original agreement for a joint adventure, in view of the inability of Stone personally to carry out its terms. As has been already set out at some length, Stone, when he approached plaintiffs and made the proposition for the agency contract in consideration of the advance of $200,000, did not disclose the method which he proposed to pursue in the purchase of the property.

In effect, he said that with $200,000 so advanced to him he would be in a position to acquire the property and to make the contract. He apparently had some kind of an option on the stock of the company, precisely what does not anywhere appear. When he had received $100,000 from defendant and $50,000 from plaintiffs, with the promise of an additional $50,000 when it should be demanded, he went to Boston to consummate the purchase. He found the controlling interest in the stock of the coal property unwilling to sell unless the purchaser would agree, also, to pay in cash for the assets of the coal company, not included in the sale of the stock. These, Stone testified, were commissary supplies and things of that nature, and their value was fixed by the seller at approximately $100,000. Again, as has been already stated, he apparently did not have this sum, and, failing in his efforts to obtain it over the telephone, he returned to New York and went directly to defendant's office.

Defendant, without communicating with plaintiffs, tentatively agreed to advance the additional sum in consideration of the delivery by Stone to it of one-fourth of the capital stock of the company he was buying. It was unwilling, however, to make any arrangement without further personal investigation, and hence one of its officers returned to Boston with Stone the next day. It then developed that, in addition to the $100,000 of new money, the guaranty of the indebtedness was a sine qua non of the sale. It is unquestionably true that this condition Stone was unable, without assistance, to comply with, and, as a result of conferences between the parties throughout that entire day and lasting well into the night, an agreement was made whereby defendant was substituted for Stone as the purchaser of the property, and Stone's interest was protected to the extent of a 25 per cent. participation in the stock, later changed by agreement between Stone and defendant to $50,000 in cash. I think it is not only shown, but that the inference is irresistible, that Stone insisted, as a condition of his own elimination and the substitution of defendant in his place, that the agreement he had made with plaintiffs should be recognized and carried out, and so it was that the contract between them provided that, upon the delivery by plaintiffs of the deferred payment of $50,000, they should be recognized as entitled to a 50 per cent. interest in the selling contract, as originally proposed.

This entire rearrangement of the plan was exclusively the work of Stone and defendant, plaintiffs being unadvised in any real sense from beginning to end of what was going on; the only intimation received by them being that there was some difficulty in Stone's carrying out his contract and that defendant might have to assist him, but that the matter was being ironed out satisfactorily. If, immediately after the consummation of the agreement of August 4th, there had been a complete and full disclosure to plaintiffs, and a demand upon them for the deposit of the additional $50,000, and a failure on their part so to do, the position of the defendant in this case would be impregnable. If, on the other hand, there had been the same frank and full disclosure, and a compliance by plaintiffs with a demand for the deposit of the additional $50,000, and a subsequent breach of the contract, or agreement to ship

them the coal, or pay them the commissions for the two-year period, a cause of action would doubtless have accrued to them.

But nothing of this sort occurred. Defendant, evidently in the expectation of additional gain to accrue to it as owner of the coal property, for a consideration which it was willing to pay, took Stone's position in the transaction, agreeing with him that it would carry out his agreement with plaintiffs. Except that, apparently, Carpenter showed the contract of August 4th to James, without explanation of the method or manner in which it was to be carried out, there was never, apparently, any further communication between them until the break occurred. And in saying this I do not overlook the testimony of Carpenter that he talked with Houston in Norfolk on August 12th. It is enough to say of that interview that, if it occurred as Carpenter claims, it shows him in a thoroughly disingenuous attitude; but my conclusion is that he is mistaken in his dates, and that, if he talked with Houston at all, it was at a later date, and after the conclusion of the entire transaction. Doubtless it was of no consequence to plaintiffs who was the owner of the coal property, so long as they had a responsible party with whom to deal, who would live up to the agreement to ship the coal and pay the commissions for the two-year period.

Granting that James understood the contract of August 4th when it was handed to him to read, I think it is fair to assume that nothing in its terms would have put him on notice of a change in this regard. That he expected that a contract would be drawn to which his firm would be a party is shown conclusively by the evidence. He requested an opportunity, when this should be prepared, to submit it to his partner. It never was prepared. The method, the manner, the conditions, the circumstances under which Stone withdrew and defendant acquired the property, were matters wholly outside his knowledge, and, apparently, I think, never understood until months after the suit was instituted. Under such circumstances, it seems to me that a court of equity would be going very far to say that his rights under the original agreement passed because one of the circumstances under which they were to arise had changed (compare Miller v. Ferguson, 107 Va. 249, 255, 57 S. E. 649, 122 Am. St. Rep. 840, 13 Ann. Cas. 138); in other words, that there was a frustration of the original enterprise, by the voluntary and secret substitution of defendant for Stone. Under the conditions then obtaining, defendant owed the duty of absolute impartiality in all it did. Granting it had the right to buy Stone's position in the transaction, it should not be allowed thereby to use that as a lever to dislodge the other interest, whose representative it then was.

Many cases are cited in the learned and exhaustive brief filed with me by defendant's counsel. I have examined them with great care, but the facts upon which they turn are essentially different from those in the suit at bar. In this case, in my idea of the situation, the joint adventure was not terminated at the August 4th meeting in Boston by the inability of Stone to carry out the agreement previously made. It was changed, of course, but the change was to substitute defendant for Stone. It took Stone's place, and all the equities against Stone were equally equities against it. If it wished to be free of its engage-

ment to plaintiffs, the way was obvious. It was at liberty to call the adventure off, because the terms upon which it embarked were unattainable, and to notify its associate to this effect. Doubtless, under such circumstances, it would have been free to deal thereafter on its own account. But this it did not do, and it may not now complain if it is required to account for profits which it never rightly was entitled to receive.

[4] The defense of invalidity in the original agreement, because violative of the terms of the statute of frauds, I think not well taken. The same defense was raised, and denied by the Court of Appeals of Virginia, in the case of Miller v. Ferguson, supra, and in that case it was held that a partnership formed for the purchase and sale of land for speculation, the profits to be divided among the partners, is valid when verbally made, and the existence of the partnership and the extent of the interests of the partners may be shown by parol. See Am. & Eng. Ency. of Law, 897, 898; 39 Cyc. 182. The bill in this case is in no sense a bill for discovery. It is, as has been already fully set out, a suit predicated upon charges of fraud in violation of a trust, and in such a case, if the evidence shows a joint adventure, the fiduciary relationship thereby created makes each of the parties trustee for the other, and a court of equity has always had jurisdiction in cases of fraud, misrepresentation, and concealment. See Maas v. Lonstorf, supra, and cases cited.

[5] Nor do I think the defense of ultra vires tenable. Whatever may be the limitations imposed on defendant by its charter as to entering into partnership with another, such limitations do not apply to a case like this. Here the agreement was to do something directly in line with the corporate purpose for which defendant was created, namely, the sale of coal on commission, and what was proposed to be done was merely a means to this end. That the coal was to be sold for joint account, to the extent of the profits arising therefrom, in no way detracts from the right to make such an agreement. Nor is there anything in the suggestion that the agreement was beyond the corporate power of defendant, because it interfered with or divested its corporate officers of their powers and duties. The simple answer is: It did nothing of the sort. It contemplated service by each of the joint adventurers, unrestricted by the control of the other, except in the exercise of good faith and fair dealing. The division of profits occurred thereafter.

Upon the whole case, therefore, my conclusion is that plaintiffs are entitled to an accounting of the profits derived by defendant from the sale of the output of the coal mine for the two-year period. That they are not entitled to any profits, if there were any, accruing from the purchase of the stock, is evident from what has been said above. Their acquisition of the stock of the coal mine was never in contemplation by the parties to the original agreement. It was, quoad themselves, wholly and entirely a new and different transaction. What defendant did in this respect was helpful rather than hurtful, for it was merely to buy out at a critical time the interest of the party with whom a contract for a selling agency for coal had been made. Plaintiffs at all times recognized this, and never at any time asserted any right in this

regard. That the negotiations and the terms of the agreement finally made were not disclosed to them does not affect the validity of the same, since they never had nor intended to have any interest therein. All that they had a right to demand was that in the negotiations and arrangements the defendant would so act with regard to the subject-matter of the trust as to preserve and protect the interests of its associate, to whom it occupied the relation of trustee; that it would acquire nothing for itself to the loss and damage of its partner.

What is now decided, therefore, is that it had the legal right to assume Stone's position in the negotiations, but only by the observance and protection of plaintiffs' rights under the agreement of sale; and, upon its failure so to do, it must respond in damages for all profits thus illegally obtained. The papers will be referred to a master, with directions to take and state the account of the net profits (ascertained by deducting from the gross commissions earned the cost of doing business and a fair return on the capital invested in the business, from August, 1920, to August, 1922).